Filed 8/27/18

# IN THE SUPREME COURT OF CALIFORNIA

CITIZENS FOR FAIR REU RATES et al.,    )
                                                                     )

         Plaintiffs and Appellants,    )

                                 )                S224779

         v.    )

                                 )       Ct.App. 3 C071906

CITY OF REDDING et al.,    )

                                 )         Shasta County

         Defendants and Respondents.    )   Super. Ct. Nos. 171377, 172960

_____)

Article XIII C of the California Constitution[1] prohibits local governments from imposing, increasing, or extending any tax without voter approval. Excepted from the definition of tax is any charge imposed for a service or product that does not exceed the reasonable costs of providing it.

The City of Redding operates an electric utility as a department of its city government. Each year, the city's budget includes a transfer from the utility's enterprise fund to the city's general fund. The transfer is designed to compensate the general fund for the costs of services that other city departments provide to the utility. The question here is whether article XIII C applies to this interfund transfer and, if so, how. We conclude that the budgetary *transfer* itself is not a tax. That is, it is not the type of exaction that is subject to article XIII C. The *rate* the city charges its utility customers is not a tax because it falls under the exception

---

[1]    Unspecified references to "article" are to the California Constitution.

1

mentioned above.  The undisputed evidence here shows that the challenged rates did not exceed the reasonable costs of providing electric service.  Because the challenged rates were not taxes, voter approval was not required.

## I.  BACKGROUND

A.    *The Rate Increase*

Operating as a city department, Redding Electric Utility (REU) provides electricity to local residents and charges rates established by the city council.  In December 2010, the council increased REU's rates.  Plaintiffs[2] filed a writ petition and complaint alleging the city's action violated article XIII C because it imposed or increased a tax without voter approval.

Subject to certain exceptions, the term " 'tax' " is now defined as "any levy, charge, or exaction of any kind imposed by a local government."  (Art. XIII C, § 1, subd. (e).)  The definition excludes a charge imposed for a specific government service or product if:  (1) the service or product is provided directly and exclusively to those who pay the charge; and (2) the charge does not exceed the reasonable costs to the local government of providing the service or product.  (Art. XIII C, § 1, subd. (e)(2).)  As discussed below, this definition was added to the constitutional scheme in November 2010.

The gravamen of plaintiffs' claim was that the city had embedded in REU's rates an excessive charge designed to compensate the city for services its other departments provided to REU.  As a result, REU's rates exceeded the reasonable

---

[2]    Plaintiffs are Citizens for Fair REU Rates, Michael Schmitz, Shirlyn Pappas, and Fee Fighter LLC.

2

costs of providing electricity and could not be increased without voter approval.[3] Some background is needed to understand this claim.

B.     *The PILOT*

Other city departments provide a variety of services to REU. These include general services, like police and fire protection, along with services provided to REU as a city department, including billing, finance, and fleet maintenance. To cover the costs, the city council adopted a practice common among municipalities that operate utilities: an annual budgetary transfer from the utility's enterprise fund to the city's general fund. An enterprise fund is a budgetary device "used to track monies received and expended for municipal services where fees or charges to the users of those services pay wholly or in part for such services." (Multari et al., Guide to Local Government Finance in California (2d ed. 2017) p. 27.) All customer rate payments are deposited in the enterprise fund. REU also realizes substantial revenue by selling excess electricity to other utilities, and from other sources as well. That revenue is also placed in the enterprise fund.[4]

From 1971 to 1988, the budgetary transfer amount was $330,000. A 1987 study concluded the city was underpaying its general fund for the services provided to its departments, including REU. The city manager informed the council that the costs of any service "<u>not</u> met through [a] service charge [transfer] . . . must necessarily be subsidized by the general taxpayer."

---

[3]     Plaintiffs also claimed the city council's action violated Government Code sections requiring electoral approval of tax impositions or increases. (Gov. Code, §§ 53722, 53723.) These statutory claims are not before us.

[4]     REU's enterprise fund is called the "electric utility fund." The city also operates waste collection, water, and wastewater utilities. Each has its own "utility fund." The term "enterprise fund" is a generic one.

3

In 1988, the city council adopted a new method for calculating the compensatory transfer, called the "payment in lieu of taxes" (PILOT). The PILOT is based on the amount REU would pay in property taxes under Proposition 13 if it were a private enterprise, rather than a city department. (See *post*, p. 9 [discussing Proposition 13].) While REU's property is not subject to taxation (art. XIII, § 3, subd. (b)), the city is entitled to recover the value of its provided services. Rather than calculate the actual cost of those services, the city used the amount a private utility would pay in property taxes as a proxy for the actual cost. The calculation was last amended in 2005, five years before the definition of "tax" was added to article XIII C.

Throughout this discussion, it will be important to distinguish between the PILOT transfer in the city's budget and the rates charged to REU's customers. When the city council increased customer rates in December 2010, it recognized the PILOT as a cost of operation. The city council resolution explained the rate increase was necessary: "(1) to meet operating expenses and to fund state-mandated programs; (2) to meet financial reserve needs and requirements; (3) to obtain funds for capital projects necessary to maintain service reliability; (4) to meet the costs of purchased power; (5) to meet required state and federal mandates; and (6) to obtain funds necessary to maintain such intra-City transfers as authorized by law." REU's financial plan for fiscal years 2009 to 2010 through 2013 to 2014 also characterized the PILOT as an operational expense of the utility.[5]

---

[5] A table summarizing REU's five-year financial plan, which was included in the city's budget for fiscal years 2009 to 2010 and 2010 to 2011, is attached at Appendix A.

4

C.     *Plaintiffs' Claims*

In challenging the rate increase, plaintiffs alleged that the PILOT: (1) was "embedded" in REU's increased rates; (2) did not reflect the city's actual costs to provide services, but was impermissibly based, like a property tax, on a percentage of the value of REU's assets; and (3) was simply a device to collect extra money from REU's customers for transfer to the city's general fund. If the PILOT did not reflect any actual cost of providing electric service and was not approved by the electorate, it was a tax under article XIII C. Plaintiffs asked the court to invalidate the rate-increase resolution to the extent it incorporated the PILOT and to enjoin enforcement of the rate increase to that same extent.

The city demurred, arguing that, if plaintiffs were alleging the PILOT itself was a tax, their claim must fail because article XIII C's operative provisions were not in effect when the PILOT was first implemented or last increased.[6] Plaintiffs then made a slight but significant adjustment to their argument. They claimed that *when* the PILOT was implemented or increased was irrelevant because they were challenging the city's enactment of "inflated *electric rates* . . . in excess of the reasonable cost of electric service to REU customers." The challenged tax, therefore, was the " '*rate* which produces the surplus revenues' " that are then transferred to the general fund to pay the PILOT. Consequently, retroactivity was not an issue presented because the "offending action . . . [was] the creation . . . of inflated electric utility rates," which occurred after the effective date of Proposition 26.

---

[6]     Plaintiffs conceded their claims were based on amendments to article XIII C that became effective after the November 2010 adoption of Proposition 26. Because the PILOT was not implemented or increased after the adoption of Proposition 26, the city argued those amendments would not apply to the PILOT.

5

The city responded that its increased rate, including the PILOT, reflected the reasonable cost of providing service. Under this theory, REU is treated like a private utility, which would pay property taxes and pass the cost to its customers through its rates. Because city-operated REU does not pay property taxes, the city loses revenue. The PILOT takes into account this "cost" of providing utility services through its own operation rather than having them provided by a taxpaying private business. The city also advanced an alternative argument. Even if the PILOT was not a reasonable cost of providing service, the rate increase did not violate article XIII C because REU's rate revenues did not exceed its other costs and its enterprise fund had sufficient non-rate revenues to pay the PILOT.

The city's alternative argument resolves the case. Consequently, we need not discuss the method used to calculate the PILOT.

D.    *The Budget Action*

In June 2011, the city council approved the city's budget for fiscal years 2011 to 2012 and 2012 to 2013. Plaintiffs sued again, challenging the budget resolution. They urged that the new budget suffered from the same defect as the previous rate increase because it incorporated the PILOT, a tax unapproved by the electorate. Plaintiffs asked the court to permanently enjoin the city from enforcing the budget resolution insofar as it affirmed or validated "the PILOT charges."

E.    *The Trial Court's Rulings*

The trial court consolidated the actions and entered judgment for the city. It held that, to the extent plaintiffs were alleging the PILOT itself was an invalid tax, the claim failed on retroactivity grounds. Plaintiffs' claims were based on Proposition 26's amendments to article XIII C, which became effective on November 3, 2010. The PILOT was an "already existing component of the REU's budget that had been in place for over 20 years," and the way it was calculated had not changed since 2005. Because the PILOT was not imposed, increased, or

6

extended on or after November 3, 2010, it "was not a new or increased tax." Nor was REU's *rate* an invalid tax, because: (1) REU had sufficient non-rate revenues in the enterprise fund to pay the PILOT, so "there [was] no evidence that the PILOT is paid out of customer's [*sic*] rates"; and (2) even if "the PILOT were part of the utility rates . . . , it could reasonably be argued that the PILOT is part of the cost of providing the service."

F.      *The Court of Appeal's Decision*

The Court of Appeal reversed in a split decision. The majority began by rejecting the trial court's retroactivity analysis. It reasoned that the PILOT was a line item in REU's budget "subject to annual discretionary reauthorization by [the] city council." Thus, as the majority put it, the PILOT could not be considered as "grandfathered in" simply because its calculation was last amended before Proposition 26's adoption. Instead, the PILOT was imposed each time a new budget was adopted.[7]

The majority then considered whether the PILOT was an invalid tax. The answer, it reasoned, "turn[ed] on whether the exception in article XIII C, section 1, subdivision (e)(2), applies." That exception excludes from the definition of "tax" any service charge that is (1) paid only by those directly served and (2) does not exceed the reasonable costs of providing the service. The majority found the PILOT did not satisfy the exception because it was not "designed to approximate the reasonable costs of providing electric service in Redding." Instead, it was a proxy amount, calculated like a property tax would be. The fact that the PILOT was paid to the general fund also supported "the conclusion that the payment

---

[7]     The majority also found that the PILOT was increased on December 7, 2010, and concluded that the city must "cost justify" that increase. The majority is incorrect. REU's *rate* was increased on December 7, 2010. The PILOT was not.

7

constitutes a revenue-generating tax." (See *Weisblat v. City of San Diego* (2009) 176 Cal.App.4th 1022, 1043.)

The majority downplayed the trial court's finding that the PILOT was not paid out of rate revenues. It reasoned that, "regardless of what else [the city] might collect from [other sources], it has imposed a PILOT — which it may do only with voter approval or if able to show it reflects [the city's] reasonable costs of providing electric service." Though it recognized the city incurred "costs to provide infrastructure and support to [REU]," the majority found the city had failed to adequately substantiate those costs by proving "the dollar amounts expended to provide electricity generation or distribution." It remanded the matter for the trial court to determine "whether the PILOT reflects the reasonable costs borne by [the city] to provide electric service."

The dissent noted that, technically, the PILOT was not "imposed on ratepayers." The dissent also concluded the PILOT was not a tax because it satisfied the reasonable cost exception. The dissent acknowledged that there was no "evidence of the *exact* benefits conferred by [the city] to [REU]." But if the PILOT conformed to the tax computation for private utilities permitted under Proposition 13, then the PILOT was a reasonable cost of providing electric service. The critical question for the dissent was whether the PILOT could properly be based on the amount a private utility would pay in property taxes. The dissent concluded it could because the Public Utilities Commission considers a private utility's tax liabilities when assessing the fairness of the utility's rates.

We take a different analytical approach. While the parties assert various complex arguments, resolution here is more straightforward.

## II. DISCUSSION

We granted review to resolve three questions: (1) Would the PILOT generally qualify as a tax under article XIII C, section 1, subdivision (e)?; (2) If so,

8

does the exception, for a charge to cover the reasonable costs of providing a service or product, apply?; and (3) If not, is the PILOT nonetheless exempt from Proposition 26 because it was in place when the ballot initiative was adopted?

A.     *Article XIII C*

The scope and application of article XIII C were recently addressed in *Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248 (*Jacks*) and *City of San Buenaventura v. United Water Conservation Dist.* (2017) 3 Cal.5th 1191 (*San Buenaventura*).  California voters have, over the past four decades, adopted a series of initiatives designed to limit the authority of state and local governments to impose taxes without voter approval.  (*Jacks*, at p. 257.)

The first of these initiatives was Proposition 13, adopted in 1978.  It added article XIII A to the state Constitution "to assure effective real property tax relief by means of an 'interlocking "package" ' " of four provisions.  (*Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 872 (*Sinclair Paint*).)  The first provision capped the ad valorem[8] real property tax rate at one percent (art. XIII A, § 1); the second limited annual increases in real property assessments to two percent (art. XIII A, § 2); the third required that any increase in statewide taxes be approved by two-thirds of both houses of the Legislature (art. XIII A, § 3); and the fourth required that any special tax imposed by a local government entity be approved by two-thirds of the qualified electors (art. XIII A, § 4).  Thus, with its first two provisions, Proposition 13 limited local government authority to increase property taxes.  Further, "since any tax savings resulting from the operation of [the first two provisions] could be withdrawn or depleted by additional or increased

---

[8]     An "ad valorem tax" is a "tax imposed proportionally on the value of something (esp. real property), rather than on its quantity or some other measure." (Black's Law Dict. (10th ed. 2014) p. 1685, col. 1.)

9

state or local levies of other than property taxes, sections 3 and 4 combine to place restrictions upon the imposition of such taxes." (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 231.)

In 1996, the voters adopted Proposition 218, known as the " 'Right to Vote on Taxes Act.' " (*Jacks*, *supra*, 3 Cal.5th at p. 259.) It added articles XIII C and XIII D to the state Constitution. Article XIII D, like the first two provisions of article XIII A, limits the authority of local governments to assess taxes and other charges on real property. (See *San Buenaventura*, *supra*, 3 Cal.5th at pp. 1203-1204.) Article XIII C buttresses article XIII D by limiting the other methods by which local governments can exact revenue using fees and taxes not based on real property value or ownership. As enacted, article XIII C provided that "[a]ll taxes imposed by any local government shall be deemed to be either general taxes or special taxes." (Art. XIII C, § 2, subd. (a).) Local governments may not impose, increase, or extend: (1) any general tax, unless approved by a majority vote at a general election; or (2) any special tax, unless approved by a two-thirds vote. (Art. XIII C, § 2, subds. (b), (d).)

Significantly, Proposition 218 did not define the term "tax." That definition was provided 14 years later, with the passage of Proposition 26 in November 2010. Proposition 26's findings stated that, despite the adoption of Propositions 13 and 218, "California taxes have continued to escalate." (Voter Information Guide, Gen. Elec. (Nov. 2, 2010) text of Proposition 26, § 1, subd. (c), p. 114.) The findings also took note of a "recent phenomenon whereby the Legislature and local governments have disguised new taxes as 'fees' in order to extract even more revenue from California taxpayers without having to abide by [the] constitutional voting requirements." (*Id*., subd. (e) unenumerated par.)

To ensure the effectiveness of Propositions 13 and 218, Proposition 26 made two changes to article XIII C. First, it specifically defined " 'tax,' " and did

10

so broadly, to include "any levy, charge, or exaction of any kind imposed by a local government." (Art. XIII C, § 1, subd. (e).) However, the new definition has seven exceptions. A charge that satisfies an exception is, by definition, not a tax. The relevant exception here involves charges "imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product." (Art. XIII C, § 1, subd. (e)(2).)[9]

Second, Proposition 26 requires the local government to prove "by a preponderance of the evidence that . . . [an] exaction is not a tax, that the amount is no more than necessary to cover the reasonable costs of the governmental activity, and that the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity." (Art. XIII C, § 1, subd. (e).)

B.      *Is Either the PILOT, or REU's Rate, a Tax Under Article XIII C?*

Based on article XIII C's structure, it is apparent that a challenge to an alleged tax involves three questions: (1) Is the alleged tax a levy, charge, or

---

[9]      The other six exceptions are for (1) charges "imposed for a specific benefit conferred or privilege granted directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of conferring the benefit or granting the privilege" (art. XIII C, § 1, subd. (e)(1)); (2) charges "imposed for the reasonable regulatory costs to a local government for issuing licenses and permits, performing investigations, inspections, and audits, enforcing agricultural marketing orders, and the administrative enforcement and adjudication thereof" (art. XIII C, § 1, subd. (e)(3)); (3) charges "imposed for entrance to or use of local government property, or the purchase, rental, or lease of local government property" (art. XIII C, § 1, subd. (e)(4)); (4) fines, penalties, or other monetary charges "imposed by the judicial branch of government or a local government, as a result of a violation of law" (art. XIII C, § 1, subd. (e)(5)); (5) charges "imposed as a condition of property development" (art. XIII C, § 1, subd. (e)(6)); and (6) "[a]ssessments and property-related fees imposed in accordance with the provisions of Article XIII D" (art. XIII C, § 1, subd. (e)(7)).

exaction imposed by a local government?; (2) Does it satisfy an exception to the definition of tax?; and (3) If it does not, was it properly approved by the voters? If a levy, charge, or exaction is imposed by a local government and does not fit within an exception, it is a tax which must be approved by the voters in order to be valid.

1.      *The PILOT Is Not a Tax*

Whether the PILOT is a levy, charge, or exaction subject to article XIII C is a question of law to be decided by independent review. (*Sinclair Paint*, *supra*, 15 Cal.4th at pp. 873-874.) The majority below did not explicitly address this question. But its reasoning shows that it considered the PILOT a potential tax under article XIII C. It explained that the city had "imposed [the] PILOT — which it may do only with voter approval or if able to show it reflects [the city's] reasonable costs of providing electric service." Thus, in the majority's view, the PILOT was a tax, requiring voter approval, unless it satisfied an exception.

The city and various amici curiae argue the majority was wrong. As one amicus puts it, "[t]he budgetary act of *transferring sums* from one fund to the other does not constitute" the imposition of a levy, charge, or exaction by a local government on those who pay the charge. Accordingly, the PILOT per se cannot be a tax. It is only the *rate*, not the PILOT, that is imposed on customers for electric service. The critical question is whether REU's rates themselves exceeded its reasonable costs of providing electricity.

Plaintiffs do not directly contest this premise. Consistent with their response to the city's demurrer (see *ante*, p. 5), they acknowledge that the PILOT itself is not a tax. They admit the "only fees, charges or exactions . . . that would come within the purview of [article XIII C] would be [REU's] electric rate." Plaintiffs recognize that the PILOT is better characterized "as a 'cost' item [that] the electric utility . . . may recover through the rates as with all other costs of the

12

enterprise." Nevertheless, plaintiffs creatively argue we should affirm the Court of Appeal's judgment because the PILOT transfer is "in the nature" of an unlawful tax. Plaintiffs argue, by reverse reasoning, that, "[i]f the imposition of the inflated rates has been found to be a 'tax' then the funds collected and transmitted for the PILOT naturally would also be 'taxes.' " Reaching into the unrelated realm of search and seizure jurisprudence, they characterize the PILOT as the " 'fruit of the poisonous tree' — with the 'poisonous tree' being the collection of electric rates in excess of the 'reasonable costs to the local government of providing the service or product[,]' . . . and the PILOT the 'poisonous fruit.' "

As we shall see, the argument fails because its presupposed premise, that rate revenues exceed reasonable costs, is not borne out by the record. Before turning to those facts, however, we address two cases relied on by both plaintiffs and the majority below: *Howard Jarvis Taxpayers Assn. v. City of Roseville* (2002) 97 Cal.App.4th 637 (*Roseville*); and *Howard Jarvis Taxpayers Assn. v. City of Fresno* (2005) 127 Cal.App.4th 914 (*Fresno*). Neither case provides the support suggested because of factual distinctions.

In *Roseville* and *Fresno*, the Courts of Appeal held that transfers like the PILOT were invalid property-related fees under article XIII D.[10] In *Roseville*, the city operated municipal water, sewer, and refuse collection utilities. (*Roseville*,

_____

[10] Under article XIII D, section 6, an agency may not extend, impose, or increase a property-related fee unless it meets all of the following requirements: (1) the revenues derived from the fee may not exceed the amount required to provide the property-related service; (2) the revenues derived from the fee may not be used for any purpose other than that for which the fee was charged; (3) the amount imposed on any parcel or person may not exceed the proportional costs of the service attributable to the parcel; (4) the service must be immediately available to the owner of the property upon which the fee is imposed; and (5) the fee may not be imposed for general governmental services. (Art. XIII D, § 6, subd. (b).)

13

*supra*, 97 Cal.App.4th at p. 638.) Each year, the city transferred to its general fund from each utility's enterprise fund four percent of the utility's total budgeted costs. (*Id*. at pp. 639, 648.) The purpose was to replace the revenue the city would have received as franchise fees from private utilities. (*Id*. at p. 639.) The full transfer amount was recovered from customers through rate payments. (*Id*. at p. 638.) The Court of Appeal held that the charge to recover the transfer amount was an invalid property-related fee because it exceeded the amounts required to provide the utility services, and because revenues derived from the charge were used for unrelated purposes. (*Id.* at pp. 647-650.)

In *Fresno*, the city operated several utilities. (*Fresno*, *supra*, 127 Cal.App.4th at p. 918.) The city charter required all utility profits to be applied to rate reductions, but permitted each utility to pay to the city's general fund an amount " 'in lieu of property and other taxes normally placed upon private business enterprises.' " (*Id*. at p. 917.) Under that authority, the city collected an in-lieu fee equal to one percent of the assessed value of each utility's fixed assets. (*Ibid*.) These fees were blended into each utility's service charges. (*Id*. at p. 918.) The *Fresno* court held the in-lieu fee invalid under article XIII D. The court acknowledged that the city "undoubtedly has . . . costs generated by the utility departments" (*id*. at p. 922), but it held the in-lieu fee invalid as calculated because the city had failed to "reasonably determine" those costs (*id*. at p. 923).

Although *Roseville* and *Fresno* involved several of the concepts at issue here, those cases are distinguishable in two key respects. First, *Roseville* and *Fresno* were decided under article XIII D, which restricts both (1) the amount of a property-related fee and (2) the manner in which fee proceeds are spent. Like an exaction subject to article XIII C, a property-related fee violates article XIII D if the revenues derived from the fee exceed the amount required to provide the property-related service. (See art. XIII D, § 6, subd. (b)(1).) But a property-

14

related fee can also violate article XIII D if revenues derived from the fee are used for any purpose other than that for which it was imposed (see art. XIII D, § 6, subd. (b)(2)) or if the fee is imposed for general government services (see art. XIII D, § 6, subd. (b)(5)). Thus, in *Roseville* and *Fresno*, the fact that the utilities were transferring rate proceeds to the cities' general funds, where those proceeds could be used for general government services, created an independent violation of article XIII D. (See *Roseville*, *supra*, 97 Cal.App.4th at p. 650.) Article XIII C contains no such restriction. So long as the amount charged by a local government for a service does not exceed the reasonable costs of providing it, the charge is not a tax. (See art. XIII C, § 1, subd. (e)(2).)[11]

*Webb v. City of Riverside* (2018) 23 Cal.App.5th 244 supports the conclusion that an interfund transfer is not a tax. There, the City of Riverside operated a municipal electric utility and, as here, made an annual transfer from the utility's enterprise fund to the city's general fund. (*Id*. at p. 248.) The city changed the methodology for calculating the interfund transfer. The change increased the *transfer amount* but not customer *rates*. (*Id*. at p. 249.) The plaintiff filed an action alleging that the "fund transfers constitute[d] a tax increase because they alter[ed] the methodology used to calculate the amount of money Riverside transfers from the electric utility reserve to the general fund." (*Id*. at p. 248.) The Court of Appeal rejected that argument, holding the relevant inquiry for purposes of article XIII C was whether the amount charged to ratepayers had increased. (*Id*.

---

**11**    Indeed, the *Fresno* court rejected an argument similar to the one plaintiffs make here. There, the city argued its in-lieu fee was not an invalid property-related fee under article XIII D because it was actually a *tax* regulated by article XIII C. (*Fresno*, *supra*, 127 Cal.App.4th at p. 926.) Though the case was decided before Proposition 26 specifically defined the term "tax," it is relevant because the court found that the city had failed to show that the in-lieu fee "constitute[d] a tax *on utilities consumers* in any meaningful sense of the word 'tax.' " (*Id*. at p. 927.)

15

at p. 259.) The court reasoned that, even if the change in methodology resulted in an increased transfer amount, there was no tax increase "if it does not increase the amount levied on Riverside ratepayers." (*Id*. at p. 260.) *Webb* correctly identifies the electric *rate* charged by the utility as the " 'levy, charge, or exaction' " subject to article XIII C's restrictions. (*Id*. at p. 258.)

Roseville and *Fresno* are distinguishable in another respect. In those cases, it was clear the interfund transfers directly increased customer rates. In *Roseville*, the Court of Appeal noted that the transfer amount was "paid by the utility ratepayers." (*Roseville*, *supra*, 97 Cal.App.4th at p. 638.) In *Fresno*, the city's charter required its utilities to apply all uncommitted profits to rate reductions and the court explained that "[t]he [transfer] amount paid by each utility is passed through to its customers." (*Fresno*, *supra*, 127 Cal.App.4th at p. 918.) Based on the records before them, those courts did not have to differentiate between the challenged interfund transfers and the rates charged by the utilities. Indeed, in *Fresno*, the plaintiffs' summary judgment motion "did not distinguish between the in lieu fee itself, imposed by Fresno on its utility departments, and the effect of the fee on ratepayers as the fee is recovered (along with all the rest of a department's budgeted costs) as part of monthly utility bills." (*Fresno*, at p. 919.)

Here, on the other hand, there is no evidence that REU customers paid the PILOT through rate payments. Instead, as described below, REU had more than enough non-rate revenue to cover the PILOT. Unlike the in-lieu fees in *Roseville* and *Fresno*, the PILOT was not necessarily passed through to and imposed on ratepayers. We reject plaintiffs' invitation to *treat* the PILOT as a tax despite their admission it is not one. It is necessary to distinguish between REU's rate and the PILOT. The majority below failed to make this distinction.

16

## 2. *Retroactive Application of Proposition 26*

As mentioned, the trial court ruled that plaintiffs' claim failed in part because Proposition 26 does not operate retroactively, and the PILOT had not been imposed, increased, or extended since November 3, 2010. Because the PILOT itself is not a tax subject to article XIII C's limitations, we need not decide whether Proposition 26 operates retroactively. REU's rate was increased after the effective date of Proposition 26. No issue of retroactive application is presented.

## 3. *Is REU's Rate a Tax?*

The question remains whether REU's *rate* was a tax. The city concedes the rate is a levy, charge, or exaction imposed by a local government and that the December 2010 rate increase was not approved by the voters. The question, then, is whether the rates paid by REU's customers exceeded the reasonable costs of providing electrical service. The reasonable costs include expenditures to generate and acquire electricity and other costs typical of utility operations. (*Hansen v. City of San Buenaventura* (1986) 42 Cal.3d 1172, 1181 (*Hansen*); see also, *Roseville*, *supra*, 97 Cal.App.4th at pp. 647-648 ["what it costs to provide such services includes all the required costs . . . , short-term and long-term, including operation, maintenance, financial, and capital expenditures."]) The city bears the burden of proof on this question. (Art. XIII C, § 1, subd. (e), unenumerated par.)

Plaintiffs argue that REU's rates did not satisfy the exception because they incorporated the PILOT. The city, they urge, failed to show the PILOT reflected any actual costs of providing electric service. If the PILOT is included in REU's budget as an expense and it exceeds the costs of services it is designed to cover, then REU's rates must necessarily be invalid taxes. The city counters that REU's rates were not taxes because REU had sufficient non-rate revenues to pay the PILOT. Put another way, the city argues the amount of the PILOT is irrelevant to

17

the determination whether the *rate* is a tax because rate revenues were not used to cover the PILOT amount. The majority below rejected this argument.

The majority's reasoning was flawed. A similar set of circumstances was addressed in *Northern California Water Assn. v. State Water Resources Control Bd.* (2018) 20 Cal.App.5th 1204 (*Northern California Water*). There, the plaintiffs challenged a water rights permit fee imposed by the State Water Resources Control Board. The evidence showed that the total costs of the permit program were approximately $9.06 million, and that "[r]oughly 51 percent of that amount was paid for by [permit] fees ($4.608 million), 43 percent from the state's general fund ($3.865 million), and the remaining 6 percent from the tobacco tax fund ($355,000), federal trust fund ($150,000), and reimbursements ($88,000)." (*Id*. at p. 1224.) The plaintiffs argued the permit fee was a tax because others, who did not pay the fee, benefitted from the program. (*Id*. at p. 1221.) Because overall program costs were higher than they would have been had the program not benefitted non-payors, the fee that contributed to covering those costs must be a tax. The Court of Appeal disagreed. It reasoned that, even though non-payors benefitted from program activities, that fact was "relevant only if the regulatory costs attributable to [them] necessarily were allocated *to the affected fee payors*. If other sources of funding, such as the state's general fund, were sufficient to cover the regulatory costs attributable to [those who benefitted but did not pay], it does not matter that [they] were not charged a fee." (*Id*. at p. 1221, italics added.) The court then concluded the fee was not a tax because "general fund support for the Division's regulatory activities . . . was more than enough . . . to cover the costs attributable to [those who benefitted but did not pay]." (*Id* at p. 1224. ) In other words, fee payors were not being forced to cover those costs because there was sufficient general fund support to cover them.

18

*Northern California Water* demonstrates that the mere existence of an unsupported cost in a government agency's budget does not always mean that a fee or charge imposed by that agency is a tax. The question is not whether each cost in the agency's budget is reasonable. Instead, the question is whether the charge imposed *on ratepayers* exceeds the reasonable costs of providing the relevant service. If the agency has sources of revenue other than the rates it imposes, then the total rates charged may actually be lower than the reasonable costs of providing the service.

The record shows that to be the case here. The city prepared a five-year financial plan for REU in 2009. (See *ante*, p. 4; see also, Appendix A.) In fiscal year 2010 to 2011, when the city council adopted the rate increase, REU was projected to collect $102.1 million in rate revenues. REU's expenses were projected as follows: power supply ($82.3 million); operations and maintenance ($28.5 million); debt service ($13.9 million); revenue-funded capital projects ($5.2 million); rolling stock and major plant maintenance ($0.8 million); and the PILOT ($6.0 million). These projected expenses would result in a $34.6 million shortfall between rate revenues and projected expenses. That gap was to be bridged with the surplus in the enterprise fund and revenues from a variety of non-rate sources.

The only expense plaintiffs challenged was the PILOT. At oral argument, their counsel conceded that they do not challenge any of REU's other projected expenses as unreasonable.[12] We return to the critical question under article XIII C. It is clear that, even if we ignore the PILOT, the rate charged does not exceed the concededly reasonable costs of providing electric service. For 2010 to 2011, projected rate revenues were $102.1 million. Unchallenged expenses were

---

[12] There is no suggestion that a significant portion of these costs must be allocated to any activity other than providing electricity to ratepayers.

$130.7 million, *excluding* the $6 million PILOT. Thus, projected, uncontested costs would exceed rate revenues by $28.6 million. Similar shortfalls were expected for subsequent years: $21 million in 2011 to 2012 and $12.6 million in 2012 to 2013.[13] In other words, for all years potentially at issue, the undisputed evidence shows that REU's rates were not taxes. Total rate revenue was less than the concededly reasonable costs of providing electric service.[14]

A fundamental premise underlying plaintiffs' argument and the majority's holding below is that the city was required to subsidize REU's rates by using its non-rate revenues. If the city were required to cover REU's expenses with non-rate revenue, the city could not claim that its use of non-rate revenue to cover the PILOT removed the rate charged from the definition of a "tax." That is, if subsidization of rates with non-rate revenue was required, the PILOT would have to be shown to be a reasonable cost because the PILOT was part of the rate calculation. But such subsidization is not required by California law. Before the

---

[13] REU projected the following expenses for fiscal year 2011 to 2012: power supply ($80.4 million); operations and maintenance ($29.4 million); debt service ($13.9 million); revenue-funded capital projects ($6.0 million); rolling stock and major plant maintenance ($1.4 million); and the PILOT ($6.1 million). Excluding the PILOT leaves $131.1 million in unchallenged costs for that year, against $110.1 million in rate revenues. (See Appendix A.) Projected expenses for fiscal year 2012 to 2013 were: power supply ($79.8 million); operations and maintenance ($30.3 million); debt service ($13.9 million); revenue-funded capital projects ($6.2 million); rolling stock and major plant maintenance ($4.0 million); and the PILOT ($6.3 million). Excluding the PILOT leaves $134.2 million in unchallenged costs, against $121.6 million in rate revenues. (See Appendix A.)

[14] We have concluded that REU's rates were not taxes because total rate revenue was insufficient to cover the operating costs that plaintiffs concede were reasonable. As a result, we need not consider the city's arguments that the PILOT was also a reasonable cost of providing electric service. Any calculation that *included* the PILOT as a reasonable cost would only establish that the gap between rate revenues and reasonable costs was even larger.

adoption of Propositions 218 and 26, the rule in California was that a municipal utility's "rates need not be based purely on costs." (*Hansen*, *supra*, 42 Cal.3d at p. 1182.) Article XIII C changed that rule, but it does not operate to require subsidization. Instead, for any service charge to which the article applies, a local government must either charge a rate that does not exceed the reasonable costs of providing the service or obtain voter approval for rates that exceed costs. Article XIII C does not compel a local government utility to use other non-rate revenues to lower its customers' rates.

Plaintiffs cite no authority for their assertion that REU was "legally required" to subsidize its rates with non-rate revenues. Settled authority runs to the contrary. "[T]here is no . . . mandate that municipally owned public utilities pass along to the ratepayers any savings in its costs of providing service." (*American Microsystems, Inc. v. City of Santa Clara* (1982) 137 Cal.App.3d 1037, 1043.) In addition, when "a governmental entity is authorized to exercise a power purely proprietary, the law leans to the theory that it has full power to perform it in the same efficient manner as a private person would." (*City of Oakland v. Burns* (1956) 46 Cal.2d 401, 407.) The majority below was wrong to reject, as irrelevant, the city's argument that REU's rates were not taxes because the PILOT was not paid out of rate revenues.

This discussion demonstrates that there was no transfer of rate payments to the general fund, as there was in *Roseville* and *Fresno*. The total revenue realized from rate payments was insufficient to cover REU's other operating expenses. As a result, all rate revenues went to covering REU's uncontested operating costs. The remaining unpaid shortfall and the PILOT had to be satisfied from REU's other sources of income. Because the budgetary transfer was not paid out of rate revenues, it was not part of a charge imposed on ratepayers. Contrary to plaintiffs'

21

assertion, the PILOT did not operate to generate "extra money" to the general fund. The rate payments simply did not generate surplus revenue.

## III.  DISPOSITION

Neither the budgetary transfer calculated by using the PILOT, nor the rate charged during the years at issue, constituted a tax under article XIII C.  The judgment of the Court of Appeal is reversed.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**MIHARA, J.***

\*       Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| Five-Year Financial Plan | Fiscal Years Ending June 30 | | | | | |
|---|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
| Electric Utility [Enterprise] Fund Beginning Balance | 40.7 | 32.2 | 25.7 | 18.9 | 15.0 | 14.7 |
| Rate Adjustments | 7.84% | 7.84% | 9.10% | 9.10% | 9.10% | 9.10% |
| *Operating Revenues* | | | | | | |
| Retail Electric Sales **[rate revenues]** | 86.3 | 93.4 | 102.1 | 110.1 | 121.6 | 134.6 |
| Wholesale Electric Sales | 26.6 | 22.7 | 18.7 | 12.2 | 11.7 | 10.5 |
| Miscellaneous Income | 6.1 | 5.4 | 5.7 | 5.9 | 6.0 | 6.2 |
| Total | 119.0 | 121.5 | 126.5 | 128.2 | 139.3 | 151.3 |
| *Operating Expenses* | | | | | | |
| Power Supply | 85.0 | 81.4 | 82.3 | 80.4 | 79.8 | 81.1 |
| Operation & Maintenance (O & M) | 26.0 | 27.5 | 28.5 | 29.4 | 30.3 | 31.2 |
| Total | 111.0 | 108.9 | 110.8 | 109.8 | 110.1 | 112.3 |
| | | | | | | |
| Net Operating Revenue | 8.0 | 12.6 | 15.7 | 18.4 | 29.2 | 39.0 |
| Total Net Debt Service | 5.2 | 10.0 | 13.9 | 13.9 | 13.9 | 14.0 |
| Revenue - Debt Service | 2.8 | 2.6 | 1.8 | 4.5 | 15.3 | 25.0 |
| *Other Revenues and Expenses* | | | | | | |
| Other Revenues | 2.1 | 1.6 | 1.2 | 0.9 | 0.7 | 0.7 |
| Bond Proceed Reimbursements | 6.0 | 2.0 | 2.0 | 4.0 | 0.0 | 0.0 |
| General Fund Payback for Land Purchase | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Revenue-Funded Capital Projects | (6.5) | (5.8) | (5.2) | (6.0) | (6.2) | (6.3) |
| PILOT | (5.2) | (6.1) | (6.0) | (6.1) | (6.3) | (6.5) |
| Rolling Stock, Major Plant Maintenance | (7.9) | (1.0) | (0.8) | (1.4) | (4.0) | (5.5) |
| Total | (11.3) | (9.1) | (8.6) | (8.4) | (15.6) | (17.4) |
| | | | | | | |
| Increase (Decrease) in Funds | (8.5) | (6.5) | (6.8) | (3.9) | (0.3) | 7.6 |
| Electric Utility Fund Ending Balance | 32.2 | 25.7 | 18.9 | 15.0 | 14.7 | 22.3 |
| Reserves (as % of O & M) | 29.0% | 23.7% | 17.1% | 13.6% | 13.4% | 20.0% |
| Debt Service Coverage Ratio | 1.93 | 1.42 | 1.22 | 1.39 | 2.14 | 2.85 |

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Citizens for Fair REU Rates v. City of Redding

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 233 Cal.App.4th 402
**Rehearing Granted**

_____

**Opinion No.** S224779
**Date Filed:** August 27, 2018

_____

**Court:** Superior
**County:** Shasta
**Judge:** William Gallagher

_____

**Counsel:**

McNeill Law Offices and Walter P. McNeill for Plaintiffs and Appellants.

Arthur Jarvis Cohen and Harry Zavos for Glendale Coalition for Better Government as Amicus Curiae on behalf of Plaintiffs and Appellants.

Trevor A. Grimm, Jonathan M. Coupal, Timothy A. Bittle and J. Ryan Cogdill for Howard Jarvis Taxpayers Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Meriem L. Hubbard and Ralph W. Kasarda for Pacific Legal Foundation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Nielsen Merksamer Parrinello Gross & Leoni, Steven A. Merksamer, Eric J. Miethke and Kurt R. Oneto for California Taxpayers Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Colantuono & Levin, Colantuono, Highsmith & Whatley, Michael G. Colantuono, Amy C. Sparrow, Michael R. Cobden, Jon R. di Cristina and Megan S. Knize for Defendants and Respondents.

Braun Blaising McLaughlin & Smith, C. Anthony Braun, Justin C. Wynne and Daniel E. Griffiths for California Municipal Utilities Association as Amicus Curiae on behalf of Defendants and Respondents.

Jarvis, Fay, Doporto & Gibson, Benjamin P. Fay and Rick W. Jarvis for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Walter P. McNeill
McNeill Law Offices
280 Hemsted Drive, Suite E
Redding, CA  96002
(530) 222-8992

Michael G. Colantuono
Colantuono, Highsmith & Whatley
790 E. Colorado Boulevard, Suite 850
Pasadena, CA  91101-2109
(213) 542-5700