Filed 12/3/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JOHN E. HUMPHREVILLE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CITY OF LOS ANGELES et al.,<br><br>    Defendants and Respondents. | B299132<br><br>(Los Angeles County<br>Super. Ct. No. BS174384) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge. Affirmed.

Blood Hurst & O'Reardon, Timothy G. Blood, Leslie E. Hurst, Jennifer L. Macpherson; Consumer Watchdog, Jerry Flanagan, Pamela Pressley, Benjamin Powell; Ajalat, Polley, Ayoob & Matarese, Richard J. Ayoob and Gregory R. Broege for Plaintiff and Appellant.

Jonathan M. Coupal, Timothy A. Bittle, and Laura E. Dougherty for Howard Jarvis Taxpayers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Michael N. Feuer, City Attorney, Kathleen A. Kenealy, Chief Assistant City Attorney, Scott Marcus, Chief, Civil Litigation Branch, Blithe S. Bock, Assistant City Attorney, Sara Ugaz, Deputy City Attorney, for Defendants and Respondents.

\* \* \* \* \* \*

Under the California Constitution, a city may impose a "general tax" only if a majority of voters within its jurisdiction so approve.  (Cal. Const., art. XIII C, §§ 1, subd. (a), 2, subd. (b).)  For these purposes, a "tax" is defined as "any levy, charge, or exaction of any kind imposed" (*id.*, § 1, subd. (e)), but excludes charges "imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product" (*id.*, § 1, subd. (e)(2)).  Here, a city-owned utility charges rates to its customers that do *not* "exceed the reasonable costs" of providing the utility service, but at the end of each fiscal year, the city routinely invokes its power under the city's charter to, via multiple steps, transfer the "surplus" in the utility's revenue fund—that is, the amount left over after paying all "outstanding demands and liabilities" which, if transferred, will not have a "material negative impact" on the utility's "financial condition" (L.A. Charter, § 344(b))—to the city's general fund.  Does this routine practice by the city constitute a "tax" that requires voter approval?  We conclude that it does not.  Accordingly, we affirm the dismissal of a lawsuit challenging the practice as being an unlawful "tax."

2

# FACTS AND PROCEDURAL BACKGROUND

## I. Facts

The City of Los Angeles (the City) owns and operates the Los Angeles Department of Water and Power (the DWP). Among other things, the DWP supplies electricity to approximately 1.4 million residential and business customers. The DWP is governed by the Los Angeles Board of Water and Power Commissioners (the Board).

Pursuant to the City's charter, the rates for the DWP's electrical service are set by City ordinance. (L.A. Charter, § 676.) The two most recent ordinances governing the DWP's electrical service rates took effect on September 19, 2008 and on April 15, 2016.

Also pursuant to the City's charter, the City has the power to "direct" that any "surplus" in the DWP's revenue fund be "transferred" to the City's Reserve Fund and then to its General Fund. (L.A. Charter, §§ 341, 344.) For these purposes, a "surplus" is defined as "the amount remaining" in the DWP's revenue fund "less outstanding demands and liabilities payable out of the fund" "at the end of the [pertinent] fiscal year." (*Id.*, § 344(b).) Although such a transfer requires the "consent" of the Board (*id.*, § 344), the Board "may withhold its consent" to such a transfer only "if, despite the existence of a surplus . . . , [the Board] finds that making the transfer would have a material negative impact on the [DWP's] financial condition in the year in which the transfer is to be made" (*id.*, § 344(b)(2)). Once in the City's General Fund, the money may be used for a variety of "government expenditures and services provided to Los Angeles taxpayers generally, such as public works, health and sanitation, community development, and police and fire services."

3

In every year since 1971, the City has invoked its power to transfer a surplus from the DWP's revenue fund. At first, the City annually transferred a surplus that came to approximately five percent of the DWP's "gross operating revenue"; since 2010, the City has transferred approximately eight percent. Because this money is by definition a surplus in the DWP's revenue fund, the City does not provide the DWP or its ratepayers with "any specific benefit, services, products or privileges" in exchange for this annual transfer. When the surplus transferred annually in recent years is broken down, it comes to $5.22 per month per DWP customer. However, the DWP does not directly pass-through the cost of this transfer of surplus to its customers with a line-item "City Transfer" charge; instead, the revenue that the City transfers as a surplus is money that would otherwise be spent by the DWP on longer-term investment projects, such as "rebuild[ing]" its "aging electricity production and distribution infrastructure."

A majority of the voters in the City has never approved the above described practice.

## II.    Procedural Background

### A.    *The pleadings*

John E. Humphreville (plaintiff) is a City resident and a DWP customer.

On July 25, 2018, plaintiff sued the City, the DWP, and the Board (collectively, the City defendants). The operative pleading is now the second amended verified petition and complaint, which was filed on February 15, 2019.[1]

---

[1]    Plaintiff's original petition and complaint was superseded by his filing of a first amended verified petition and complaint in

4

In that pleading, plaintiff alleges that the City, the DWP and the Board annually engage in "a series of preplanned interrelated steps"—namely, (1) the DWP and the City agree that the DWP will transfer to the City a specified percentage of the DWP's gross operating revenue, (2) both the DWP and the City budget for this transfer, (3) the DWP collects revenue from its customers, and (4) the City then invokes its power to transfer a surplus in the agreed-upon percentage. When "properly viewed together" as "a single amalgamated transaction," plaintiff goes on to allege, the transaction "constitut[es] a tax on LADWP ratepayers" that requires voter approval.[2] Because the City has not obtained the necessary voter approval, the operative pleading seeks (1) a declaration against the City defendants that the annual transfer of surplus is unconstitutional, (2) an injunction against the City defendants prohibiting further transfers of surplus until a majority of voters has approved the tax, and (3) a writ of mandate against only the City to the same effect. Plaintiff also seeks attorney fees under Code of Civil Procedure section 1021.5.

## B. *Demurrer*

The City defendants demurred on two grounds—namely, (1) plaintiff's lawsuit is effectively an untimely challenge to the City's 2008 and 2016 rate ordinances, and (2) the City's practice

October 2018. The trial court sustained a demurrer to the first amended verified petition with leave to amend.

[2] Of course, the allegation that this transaction constitutes a "tax" is a legal conclusion that we can and do disregard. (*Roy Allen Slurry Seal, Inc. v. American Asphalt South, Inc.* (2017) 2 Cal.5th 505, 512 (*Roy Allen*).) Indeed, the propriety of this legal conclusion is the very question presented in this appeal.

of transferring a surplus from the DWP is not a "tax" because, under *Citizens for Fair REU Rates v. City of Redding* (2018) 6 Cal.5th 1 (*City of Redding*), "a municipality can transfer money from its electric utility to its general fund so long as the electric rate charged by the utility does not exceed the reasonable costs of service."

After a full round of briefing and a hearing at which plaintiff clarified that he was "not alleging that the rate [charged by the DWP] exceeds the cost of providing electrical service," the trial court issued a six-page order sustaining the demurrer without leave to amend. The court cited two reasons. First, the court found that plaintiff's challenge to the City's transfer of a significant surplus from the DWP revenue fund every year was, at bottom, an accusation that the DWP's "electric rates exceed the reasonable costs of [providing the] service." Because the "gravamen" of this claim called for a "'review'" of the DWP's rates for electrical service, it was subject to the 120-day statute of limitations set forth in Public Utilities Code section 10004.5. And because plaintiff's July 2018 lawsuit was filed more than 120 days after the City's latest 2016 rate ordinance, the lawsuit was untimely. Second, and alternatively, the court held that, "if"—as plaintiff insists—the DWP's "charges do not exceed the reasonable cost of service," then the City's practice of transferring a surplus from the DWP's revenue fund each year did not constitute a "tax" in light of the *City of Redding*'s holding that "budgetary transfer[s]" in such a context are "not a tax."

C. *Appeal*

Following entry of judgment, plaintiff filed this timely appeal.

## DISCUSSION

Plaintiff argues that the trial court erred in sustaining the City defendants' demurrer to his operative pleading. Were we to conclude, as have some courts, that plaintiff remains bound by the allegations he has included in his prior verified pleading (but has omitted from the operative pleading) that the DWP was inflating its rates by "embedd[ing]" the amount of the annual surplus transfer "in the amount [the DWP] charges its customers for electric service," then plaintiff's lawsuit would constitute a challenge to the City's 2016 rate ordinance that is untimely under the 120-day statute of limitations set forth in Public Utilities Code section 10004.5. (*Webb v. City of Riverside* (2018) 23 Cal.App.5th 244, 256 (*Webb*); Pub. Util. Code, § 10004.5.) But were we to look to the operative pleading alone and were we to accept plaintiff's repeated assertions that "the rate" the DWP charges its customers "is perfectly fine" but leaves the DWP "under-fund[ed]," then this case squarely presents the following question: If the rate that a city-owned utility charges its customers does not exceed the reasonable costs of providing that service, does the city's ongoing practice of transferring a portion of the utility's surplus revenue to the city's general fund constitute a "tax" requiring voter approval under the California Constitution?[3]

This is a question we independently review because it arises on appeal from a demurrer (*Roy Allan*, *supra*, 2 Cal.5th at

---

[3] Because we focus on whether the City's conduct—as alleged in the operative complaint—constitutes a "tax" rather than whether it is time barred, we have no occasion to consider the arguments offered by plaintiff and its amicus as to why the 120-day statute of limitations is inapplicable or unfair to apply in this case.

7

p. 512), because it entails interpretation of a voter-enacted constitutional provision (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1032, 1036-1037 (*Professional Engineers*)), and because it requires us to determine "[w]hether a statute imposes a . . . tax" subject to voter approval (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1046 (*California Building*); *City of Redding*, *supra*, 6 Cal.5th at p. 12).  In light of our independent review, we may affirm on any ground stated in the demurrer "whether or not the [trial] court acted on that ground." (*Carman v. Alvord* (1982) 31 Cal.3d 318, 324.)

## I. The Law Governing Voter Approval of Taxes

Through a series of initiatives—Proposition 13 in 1978, Proposition 218 in 1996, and Proposition 26 in 2010—California voters have "limit[ed] the authority of state and local governments to impose taxes without voter approval."  (*City of Redding*, *supra*, 6 Cal.5th at p. 10; see also *id.* at pp. 10-12 [cataloging history of initiatives]; *Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 258-261 (*Jacks*) [same]; *Schmeer v. County of Los Angeles* (2013) 213 Cal.App.4th 1310, 1318-1326 [same].) Under the law as currently written, a "local government"—which includes a "city"—may adopt a "general tax" (that is, a "tax imposed for general governmental purposes") only if the proposed tax is "submitted to the electorate and approved by a majority vote" (Cal. Const., art. XIII C, §§ 1, subd. (a) [defining "general tax"], 2, subd. (b) [setting vote requirement]), and may adopt a "special tax" (that is, a "tax imposed for specific purposes") only if the proposed tax is "submitted to the electorate and approved by a two-thirds vote" (*id.*, §§ 1, subd. (d) [defining "special tax"], 2, subd. (d) [setting vote requirement]).  (See also *id.*, § 1, subd. (b)

8

[defining "local government"].) If revenue from a tax is placed in a city's general fund without being earmarked for specific uses, it is considered a "general tax." (*Webb*, *supra*, 23 Cal.App.5th at p. 258; *Gonzalez v. City of Norwalk* (2017) 17 Cal.App.5th 1295, 1306.)

Of course, these provisions only apply if the local government is seeking to levy a "tax." (*City of Redding*, *supra*, 6 Cal.5th at p. 12 [observing that this is the first, threshold question].) Since the enactment of Proposition 26 in 2010, "tax" has been broadly defined to encompass "any levy, charge, or exaction of any kind imposed by a local government." (Cal. Const., art. XIII C, § 1, subd. (e); *City of Redding*, at p. 11 [noting breadth of this definition; *City of San Buenaventura v. United Water Conservation Dist.* (2017) 3 Cal.5th 1191, 1200 (*City of San Buenaventura*) [same].) However, this definition has seven exceptions. One of them is pertinent here: A "tax" does *not* include "[a] charge imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product." (Cal. Const., art. XIII C, § 1, subd. (e)(2).) This exception reflects the practical reality that it is only when a charge for a specific service or product exceeds its cost that the charge "'become[s] a vehicle for generating revenue'" and, hence, is a "tax." (*California Building*, *supra*, 4 Cal.5th at p. 1046, quoting *Jacks*, *supra*, 3 Cal.5th at p. 261.) In assessing whether the charge for a specific service or product exceeds the costs of providing it, the costs allocated to each payor must also "bear a fair or reasonable relationship to the payor's burdens on, or the benefits received from, the governmental activity." (Cal. Const., art. XIII C, § 1,

9

subd. (e); *City of San Buenaventura*, at pp. 1213-1214.) The local government bears the burden of proving that its proposed tax fits within this exception. (Cal. Const., art. XIII C, § 1, subd. (e).)

## II. Analysis

The City's alleged, ongoing practice of transferring a "surplus" from the DWP's revenue fund to the City's General Fund where, as also alleged, the rates charged by the DWP to its customers nevertheless do not exceed the costs of providing electricity to them, does not constitute a "tax" for three reasons.

First, the practice does not satisfy the definition of a "tax" under the plain language of the California Constitution. Although the monthly charge that the DWP—as an entity owned by the City—assesses its customers constitutes a "charge . . . imposed by a local government" and is therefore a "tax" (Cal. Const., art. XIII C, § 1, subd. (e)), that charge falls within the exception to the definition of "tax" set forth above (1) because the amount the DWP charges its customers for electric service is "for a specific government service . . . provided directly to the payor" (here, the DWP customer) "that is not provided to" non-DWP customers, (2) because that charge "does not exceed the reasonable costs to the local government of providing th[at] service," and (3) because that charge "bear[s] a fair or reasonable relationship to the [customer']s burdens on, or the benefits received from, the governmental activity" because the rate is tied to each customer's monthly usage (*id.*, § 1, subd. (e)(2)). We know this because it is the *very premise* of this iteration of plaintiff's lawsuit: In order to avoid the statute of limitations attaching to any challenge that the City's surplus transfer makes the DWP's rates higher than its costs, plaintiff has pled that he is "*not* challeng[ing] the rate schedule from which electric bills are

10

calculated" (italics added), and has further elaborated that he is "not alleging that the rate [charged by the DWP] exceeds the cost of providing electrical service." This may place plaintiff's lawsuit outside the statute of limitations bar set by Public Utilities Code, section 10004.5, but it simultaneously puts the DWP's monthly charge outside the definition of a "tax." Plaintiff urges that we should construe voter initiatives liberally. This is true (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 776), but it does not empower us to ignore the plain language of the Constitution (*People v. Cruz* (1974) 12 Cal.3d 562, 566; *Professional Engineers*, *supra*, 40 Cal.4th at p. 1037). Under that plain language, the DWP's monthly charge for electric service—even though a portion of that charge eventually ends up in the City's General Fund—is not a "tax."

Second, this conclusion is the one that best accords with the purpose behind our Constitution's restrictions on local taxation— namely, to stop "local governments" from "extract[ing] even more revenue *from California taxpayers . . . .*" (Voter Information Guide, Gen. Elec. (Nov. 2, 2010) text of Prop. 26, § 1, subd. (e), p. 114, italics added; see Historical Notes, 2B West's Ann. Cal. Const., foll. art. XIII A, § 3, p. 297.) This purpose can be implicated where a city imposes a franchise fee on a private utility, which is then passed-through to each customer as a line-item on their monthly bills; in that situation, the city is using the utility as a proxy and the monthly fee is a "tax" unless the amount of that line-item fee is reasonably related to the benefit of the franchise. (*Jacks, supra,* 3 Cal.5th at pp. 254, 269; accord, *Zolly v. City of Oakland* (2020) 47 Cal.App.5th 73, 88 [city's imposition of a franchise fee on a third-party waste hauler that is passed onto taxpayers may be a "tax"].) This purpose can also be

11

implicated when a city transfers money from its city-owned utility to itself when those transfers require the utility to increase what it charges its customers and, in so doing, causes the utility's rates to exceed the costs of actually providing the pertinent service because, in that situation, the interfund transfer is having a bottom-line effect on the taxpayer.  (*City of Redding*, *supra*, 6 Cal.5th at p. 15 [so noting]; cf. *Howard Jarvis Taxpayers Assn. v. City of Roseville* (2002) 97 Cal.App.4th 637, 638, 648 [city's imposition of "in-lieu franchise fee" on its city-owned utility is a "tax" under article XIII D when it increases utility rates and fee does not correlate with costs]; *Howard Jarvis Taxpayers Assn. v. City of Fresno* (2005) 127 Cal.App.4th 914, 918, 927-928 [same].)

But is this purpose of protecting taxpayers from hidden taxes implicated where, as plaintiff concedes here, the interfund transfer does *not* affect the amount the utility charges and does not otherwise cause the utility's rates to exceed its costs?  We conclude the answer is "no" because, in this situation, the "California taxpayer" is entirely unaffected by the subsequent interfund transfer.  Plaintiff urges that the DWP is getting the raw end of the deal in the subsequent interfund transfer because the DWP is getting "zero" in exchange for the "surplus" that the City removes from the DWP's revenue account each year and the transfers effectively "under-fund[] the [DWP] to the benefit of the City."  What the City is doing may be unwise management of the municipal utility, but alleged mismanagement that does not affect the taxpayers does not constitute a "tax."[4]  What is more,

_____

4	Plaintiff colorfully likens the City to a "local strongman" whose annual transfer of surplus funds is akin to the coerced payment of "protection money" by a local "shopkeeper."

plaintiff's argument would convert the constitutional protection against local taxation without voter approval into a tool for examining whether each and every transfer of funds from a city-owned utility to its city had a corresponding benefit to the utility, on a line item-by-line item basis, even if those transfers had no effect on the utility customer/taxpayer. This goes beyond the purpose of those protections.

Finally, our Supreme Court's decision in *City of Redding* strongly suggests that the City's yearly transfers of surplus funds do not constitute a "tax" when they do not cause the DWP's rates to exceed its costs of providing electricity. In *City of Redding*, the city transferred money from its public utility to its general fund "to compensate" the city for "the costs of services that other city departments provide[d] to the utility." (*City of Redding*, *supra*, 6 Cal.5th at p. 4.) However, the rate the utility charged its customers "did not exceed the reasonable costs of providing electric service." (*Id.* at p. 5.) In this situation, *City of Redding* concluded that the "interfund transfer [was] not a tax." (*Id.* at p. 14.) The court explained:

> "The question is not whether each cost in the [utility's] budget is reasonable. Instead, the question is whether the charge imposed *on ratepayers* exceeds the reasonable costs of providing the relevant service."

(*Id.* at p. 17.) Because the "[t]otal rate revenue was less than the concededly reasonable costs of providing electric service," *City of*

---

Indulging this analogy confirms our point. If, as plaintiff alleges here, the shopkeeper does not increase its prices and effectively "eats" the cost of the protection itself, the shopkeeper's customer is in no way being "taxed" by the thug's racketeering.

*Redding* concluded that the interfund transfers from the city utility to the city were not "taxes" that required voter approval. (*Id.* at p. 18.)

As plaintiff points out, *City of Redding* is not identical to this case. There, the interfund transfer was to compensate the city for services it was providing to the city-owned utility, and the city-owned utility was able to pay for the transfer out of money taken from sources other than revenue from ratepayers. (*City of Redding*, *supra*, 6 Cal.5th at pp. 5-6, 15.) But neither of these distinctions render *City of Redding*'s reasoning inapplicable here: At its core, *City of Redding* held the transfers of funds from a city-owned utility to a city's general fund are not a "tax" when "the charge imposed *on ratepayers*" does not "exceed[] the reasonable costs of providing the relevant service." (*Id.* at p. 17.) That holding applies with full force to this case.

Plaintiff offers what boil down to three categories of further arguments against this conclusion.

First, plaintiff urges that the City's annual transfer of surplus funds from the DWP to itself constitutes a "tax" under the plain language of the Constitution. Specifically, plaintiff argues that the interfund transfer does not fall into the exception for "charge[s] imposed for a specific government service or product" because the City is not providing any "specific government service or product" to the DWP (or, for that matter, to the DWP's customers like plaintiff). For support, plaintiff weaves in the more general proposition that this charge must be a "tax" because "taxes are imposed for revenue purposes, rather than in return for a specific benefit conferred . . . ." (*Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 874, superseded in part by Proposition 218.) With this argument,

14

plaintiff would have us look to whether *the public utility* got something in exchange when the City transferred the surplus funds, regardless of whether the utility's customer felt the effects of that subsequent transfer. This is precisely the argument rejected by *City of Redding*, *supra*, 6 Cal.5th 1, when it held that what matters is "whether the charge imposed *on ratepayers* exceeds the reasonable costs," and "not whether each cost in the [utility's] budget is reasonable." (*Id.* at p. 17.) *City of Redding* construes the constitutional text to focus on the financial relationship *between the ratepayer and the city-owned utility*, and not—as plaintiff urges—between the city-owned utility and those to whom the city-owned utility transfers its revenue. We must adhere to this construction.

Second, plaintiff asserts that we must look to the "economic reality of the taxed transaction" (*Microsoft Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 750, 760; accord, *Commissioner v. Court Holding Co.* (1945) 324 U.S. 331, 334 ["[t]he incidence of taxation depends upon the substance of a transaction"]), which in this case shows that the City, through the four-step process alleged in the operative complaint, is taking money paid by the DWP's customers for electric service and using it for general city services. Plaintiff invokes the age-old maxim that courts look to the substance of a transaction and not its form (Civ. Code, § 3528 ["The law respects form less than substance"]; e.g., *Epstein v. Hollywood Entertainment Dist. II Bus. Improvement Dist.* (2001) 87 Cal.App.4th 862, 872 [applying maxim]), as well as the corollary "step transaction doctrine" that looks to the overall effect of a taxpayer's transaction to see whether it has effected a taxable transfer of ownership (e.g., *Shuwa Investment Corp. v. County of Los Angeles* (1991) 1 Cal.App.4th 1635, 1648-1653).

15

Plaintiff is correct that the substance or "economic reality" is what matters in assessing whether a particular series of transactions imposes a "tax."  But the City's multi-phase machinations in no way alter the economic reality that the DWP's customers are getting a service commensurate with its cost regardless of any behind-the-scenes transfers of funds effected by the City.  Because the effect on *the ratepayer* is what matters (*City of Redding, supra,* 6 Cal.5th at p. 17), there is no "tax."

Lastly, plaintiff contends that the City has deliberately engaged in Machiavellian-esque manipulations in order to "pad[] its general fund" without first obtaining voter approval.  The nefariousness or deviousness of the City's motives, however, cannot turn what is not a "tax" *into* a "tax."  (E.g., *Rider v. County of San Diego* (1991) 1 Cal.4th 1, 10 ["the possible improper motivations of the Legislature . . . are immaterial to questions involving the validity of such legislation"]; *County of L.A. v. Superior Court* (1975) 13 Cal.3d 721, 726 [same].)  That is because "good or bad faith" of a public entity in adopting a law "does not affect the practical, substantive impact of [its] actions on the electorate."  (*County of Kern v. T.C.E.F., Inc.* (2016) 246 Cal.App.4th 301, 323.)

*     *     *

Because plaintiff will be bound in any future amended complaints by the same verified allegations that doom his claims now (*Webb, supra,* 23 Cal.App.5th at p. 256), he cannot cure these defects by amendment and the trial court properly sustained the demurrer without leave to amend.  (Accord, *T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.)

16

## DISPOSITION

The judgment is affirmed.  The City defendants are entitled to their costs, if any, on appeal.

**CERTIFIED FOR PUBLICATION.**


_____, J.
HOFFSTADT

We concur:


_____, P. J.
LUI


_____, J.
ASHMANN-GERST

17