Filed 11/30/22 Saavedra v. City of Glendale CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| JUAN SAAVEDRA et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF GLENDALE, <br><br> Defendant and Respondent. | B310212 <br> (Los Angeles County <br> Super. Ct. No. BC539160) <br><br> ORDER MODIFYING OPINION <br> AND DENYING REHEARING <br><br> [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on October 31, 2022 be modified as follows:

1. On page 5, the first sentence under the heading "**The City Increases Retail Rates in 2006**" is modified to delete the phrase "effective July 1, 2007." The modified sentence shall read:

In May 2006, the City amended the Glendale Municipal Code to increase electric rates based on a staff report to the city council prepared that same month (2006 Staff Report).

2. On page 6, in the chart at the bottom of the page, the last row in the column on the left side of the chart is modified as

follows: the phrase "Transfers (included in Base Revenues)" shall be replaced with the phrase "Transfers (included in Base Expenses)."

3. On page 25, the items that follow the phrase, "included in the rate structure:" are modified as follows:

First, the item that reads, "(Base Rate Expenses ($56,530,000) + FAC Expenses ($56,530,000)) – GFT ($18,254,000) = Permitted Costs ($148,008,000)" is modified to state:

Base Rate Expenses ($110,501,000) + FAC Expenses ($56,530,000) – GFT ($18,254,000) = Permitted Costs ($148,777,000).

Second, the item that reads, "Total Retail Revenue ($162,785,000) – Permitted Costs ($148,008,000) = Excess Rate Revenue ($14,008,000)" is modified to state:

Total Retail Revenue ($162,785,000) – Permitted Costs ($148,777,000) = Excess Rate Revenue ($14,008,000).

Third, the item that reads, "Excess Rate Revenue ($14,008,000) / Permitted Costs ($148,008,000) = Tax Rate 9.42 percent" is modified to state:

Excess Rate Revenue ($14,008,000) / Permitted Costs ($148,777,000) = Tax Rate 9.42 percent.

There is no change in the judgment.

The petition for rehearing is denied.

NOT TO BE PUBLISHED.

_____

MOOR, J.                     RUBIN, P. J.                     KIM, J.

2

Filed 10/31/22  Saavedra v. City of Glendale CA2/5 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JUAN SAAVEDRA et al., | B310212 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC539160) |
| v. | |
| CITY OF GLENDALE, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed.

Schwartz, Steinsapir, Dohrmann & Sommers, D. William Heine and Daniel E. Curry for Plaintiffs and Appellants.

Colantuono, Highsmith & Whatley, Michael G. Colantuono, David J. Ruderman, Jon R. di Cristina; City of Glendale, Michael J. Garcia and Christine A. Godinez for Defendant and Respondent.

_____

Plaintiffs and appellants Juan Saavedra and the International Brotherhood of Electrical Workers Local 18, AFL-CIO (collectively the Union) appeal from the trial court's judgment, contending the court erred by ruling that defendant and respondent City of Glendale (the City) did not raise taxes without voter approval in violation of article XIII C of the California Constitution when in 2013 it increased its electric utility's rates for subsequent years.

On appeal, the Union argues that the trial court incorrectly calculated the tax included in the utility rates adopted in 2013, and that the trial court's comparison of the tax imposed in 2013 to the tax previously imposed through rates adopted in 2006 was fundamentally flawed. The Union further contends that the trial court erred by abandoning this court's formula for determining the amount of tax included in utility rates, as set forth in our prior opinion.[1]

We find no error in the trial court's methodology or calculations. We conclude that substantial evidence supports the trial court's findings and affirm the judgment.

---

[1] In light of our disposition, we do not address the other contentions raised in the Union's opening brief. Any issues raised for the first time in the Union's reply brief are waived. (See *Lester v. Lennane* (2000) 84 Cal.App.4th 536, 595 [claims of error raised for the first time in reply brief are waived].)

# BACKGROUND AND PROCEDURAL HISTORY[2]

## *Background*

Glendale Water and Power (the Utility) is a department within the City that operates an electric utility. Article XI, section 22 of the City's charter has long provided for an annual transfer (the GFT) from the Utility's revenue fund to the City's general fund.[3] The City council may reduce or waive the GFT to insure the sound financial position of the Utility. (*Ibid.*)

California voters enacted a series of voter initiatives beginning with Proposition 13 in 1978, amending the California

---

[2] The following background and procedural history are summarized from our prior unpublished opinion in *Saavedra v. City of Glendale* (Dec. 27, 2018, B281991) (*Saavedra I*). For purposes of this appeal, we discuss only the procedural history subsequent to *Saavedra I* in depth.

[3] Section 22 of article XI of the charter provides: "A fund to be known as the Glendale Water and Power surplus fund is hereby created, to which fund shall be credited from the receipts of the department of Glendale Water and Power in the waterworks revenue fund and the electric works revenue fund, any amounts in excess of the requirements of the several funds as hereinbefore set forth. Except as otherwise provided in this section, disbursements from said Glendale Water and Power surplus fund may be made by the council by special appropriation for waterworks or electric works purposes only, which shall include payment of all or any portion of the tax of the Metropolitan Water District of Southern California, or its successors in interest, which the council may elect to pay out of the funds of the City of Glendale. [¶] At the end of each fiscal year an amount equal to twenty-five (25) percentum of the

3

Constitution to limit the ability of state and local governments to collect revenue through taxes, fees, charges, and other levies without voter approval.  (Cal. Const., arts. XIII A, XIII C, XIII D.)  Proposition 218 added article XIII C to the California Constitution in 1996.  (*Howard Jarvis Taxpayers Assn. v. City of Fresno* (2005) 127 Cal.App.4th 914, 918.)  Article XIII C prevents local governments from assessing general or special taxes without obtaining voter approval.  Under article XIII C, local governments may not impose, extend, or increase a general tax without obtaining approval from a majority of the voters, or impose a special tax without approval of two-thirds of the voters.  (Cal. Const., art. XIII C, § 2, subds. (b), (d).)

A "[g]eneral tax" is "any tax imposed for general governmental purposes."  (Cal. Const., art. XIII C, § 1, subd. (a).)  A "[s]pecial tax" is "any tax imposed for specific purposes, including a tax imposed for specific purposes, which is placed into a general fund."  (*Id.*, art. XIII C, § 1, subd. (d).)  "Local government" includes "any county, city, . . . charter

---

operating revenues of the department of Glendale Water and Power for such year, excluding receipts from water or power supplied to other cities or utilities at wholesale rates, shall be transferred from said Glendale Water and Power surplus fund to the general reserve fund; provided, that the council may annually, at or before the time for adopting the general budget for the ensuing fiscal year, reduce said amount or wholly waive such transfer if, in its opinion, such reduction or waiver is necessary to insure the sound financial position of said department of Glendale Water and Power and it shall so declare by resolution.  (1921; 1931; 1941; 1946; 1949.)  [¶]  (Res. No. 04-238, § 1, 12-7-2004)."

4

city, . . . special district, or any other local or regional governmental entity." (*Id.*, art. XIII C, § 1, subd. (b).)

"A tax is imposed when first enacted. [Citation.] A tax is extended when an agency lengthens the time period during which it applies. [Citation.] A tax is increased when an agency revises its methodology for calculating a tax and the revision results in increased taxes being levied on any person or parcel." (*Webb v. City of Riverside* (2018) 23 Cal.App.5th 244, 258 (*Webb*).)

## The City Increases Retail Rates in 2006

In May 2006, the City amended the Glendale Municipal Code to increase electric rates, effective July 1, 2007, based on a staff report to the city council prepared that same month (2006 Staff Report). The 2006 Staff Report recommended approval of two ordinances amending electric rates effective July 1, 2006, and July 1, 2007, respectively.

The 2006 Staff Report projections showed that retail rates would be insufficient to fully recover the costs of service provided to customers through electric operations and that under-collection of fuel adjustment charges for the purchase of natural gas had caused the Utility to suffer financial losses. The financial objectives that the Utility sought to achieve through the rate increases included generating sufficient cashflow from operations to fund capital improvement projects within five years and generating sufficient cashflow in excess of sustaining capital improvement projects to replenish and maintain reserves to the desired levels as set forth in the cash reserve policy within 10 years.

The 2006 Staff Report described the retail rate structure: "There are two components in [the Utility] electric rate structure: a base rate component and a fuel adjustment component. The base rate is designed to recover the direct and indirect costs of providing the infrastructure to serve local customers. Such costs include, but are not limited to, the costs associated with transmission and distribution, customer service, and administration. The base rate should also include a reasonable rate of return on investments to effectuate the transfer to the City's General Fund, and to establish sufficient reserves for ongoing capital improvement projects that ensure the reliability and integrity of the system infrastructure and upgrade the generation assets to improve the cost structure and competitiveness of the energy resources." The fuel adjustment component imposes a fuel adjustment charge (FAC) on each rate to recover the costs of fuel and purchased power.

The 2006 Staff Report made projections for fiscal year 2007 to 2008 based on the proposed increases as follows:

| FISCAL YEAR | 2007-2008 |
|---|---|
| Base Revenues | $104,847,000 |
| Base Expenses | $110,501,000 |
| FAC Revenues | $57,938,000 |
| FAC Expenses | $56,530,000 |
| Transfers (included in Base Revenues) | -$18,254,000 |

6

## The Voters Pass Proposition 26 in 2010

Proposition 26, effective in November 2010, added subdivision (e) to article XIII C, section 1.  Subdivision (e) broadly defines a "tax" for purposes of article XIII C to mean "any levy, charge, or exaction of any kind imposed by a local government," with seven exceptions.  (Cal. Const., art. XIII C, § 1, subd. (e).)  If a charge falls within one of the exceptions, the charge is not a tax as a matter of law.  (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1048.)  As relevant in this case, a tax does not include a "charge imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product."  (Cal. Const., art. XIII C, § 1, subd. (e)(2).)

## The Utility Reduces Its Workforce in 2012

In June 2012, the Utility made an annual GFT, transferring $21,107,000, from its revenue fund to the City's general fund.  In October 2012, the City notified Utility employees that a reduction in force was necessary due to a shortfall in the electric fund.  The amount of the shortfall was equal to approximately half of the GFT.

At the end of the 2013 fiscal year, the Utility transferred $20,857,000 to the City's general fund.  The Utility's cash reserve funds were reduced to 59.4 percent of the required cash reserve level.

## The City Raises Retail Rates in 2013

In 2013, the City's general manager submitted a report to the city council recommending that the City increase electric rates over five years as follows:  8 percent in fiscal year 2014; 7 percent in 2015; 5 percent in 2016; 2 percent in 2017; and 2 percent in 2018.  The recommended rate plan would accomplish several objectives and bring the Utility closer to its cash reserves goal of $124 million, although the Utility would remain short of the target balance for reserves by approximately $10 million. The report listed measures the City had taken to reduce the Utility's operating costs, including reducing the amount that the Utility transferred annually to the general fund by $250,000 per year.

The City employed a rate consultant company in 2013, Borismetrics, who completed a cost of service analysis and electric rate design study (the Rate Study) for the Utility based on data from fiscal year 2012.  To perform the Rate Study, Borismetrics relied in part on a pro forma financial model (the Pro Forma) prepared by City staff that "project[ed] expenses and revenues from fiscal year 2013–14 through fiscal year 2017–18 under various assumptions, such as rate changes, cash reserve levels and power and fuel costs."  The Rate Study concluded that "to maintain financial viability, debt service coverage and cash reserve margins, average annual retail rate increases of 8%, 7%, 5%, 2% and 2% are required for fiscal years 2013-14 through 2017-18, respectively."

The Rate Study stated that absent increases in retail rates, "Cash Reserves . . . [would] deteriorate[ ] significantly.  Shrinking cash reserves undermine[ ] debt service coverage, and thus

ultimately lead[] to no future capital investments . . . required to maintain the [Utility] electric system.  Currently, retail revenues do not cover all of [the Utility] costs, so Cash Reserves are and have been used instead.  As a result, cash balances have declined to an unsustainably low position."  "With the proposed series of annual rate increases, [the Utility]'s financial situation recovers over the five year planning horizon.  Cash reserves approach but do not reach the City Council's policy target of $124 million and the utility should be able to sustain a pay-as-you-go capital program in addition to borrowing for capital investments."

The Rate Study included a summary of the Utility's revenue requirements for fiscal year 2012.  The Rate Study recategorized the revenues and expenses contained in the Pro Forma for purposes of its cost of services analysis.  The Rate Study explained, "The objectives of a cost of service study are different from those of determining revenue requirements for the utility."  A "revenue requirement analysis [(i.e., the Pro Forma)] is concerned with comparing the projected operating revenues to the projected operating and capital expenses for the utility to determine an overall adjustment to rates."

The Rate Study categorized rate requirements in fiscal year 2012 differently than the Pro Forma for purpose of allocating costs among the Utility's four customer classes.  Costs were identified as follows: power and transmission costs of $148,342,000, distribution costs $42,349,000, and customer service costs of $7,073,000, for a total revenue requirement of $197,764,000.  Within those categories, two subcategories were characterized as nonoperating expenses:  "Power Management Non-Operating Expenses" of $5,946,000 (in the power and transmission category) and "Electric Services Non-Operating

9

Expenses" of $19,143,000 (in the distribution category). A GFT charge was listed separately as a "Transfer to Other Funds" in the amount of $21,107,000.

The Pro Forma that the Rate Study relied upon included the following projections based on the recommended rate increases:

| FISCAL YEAR | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Operating Revenue | $170,690,622 | $183,552,160 | $193,693,417 | $198,562,343 | $203,546,257 |
| Non-operating Revenue | $7,851,641 | $8,027,381 | $8,099,475 | $9,023,217 | $9,111,882 |
| Operating Expenses | $164,897,661 | $159,994,172 | $161,806,252 | $164,870,129 | $170,220,575 |
| Non-operating Expenses | $5,137,265 | $5,208,425 | $5,147,675 | $6,996,456 | $8,260,806 |
| Transfers to Other Funds | $20,607,000 | $20,357,000 | $20,107,000 | $19,857,000 | $19,607,000 |
| Retail Net Income | -$12,099,663 | $6,019,945 | $14,731,965 | $15,861,974 | $14,569,759 |

In August 2013, the City voted to raise the Utility's retail rates for fiscal years 2014 through 2018. The rate increases included allocations for annual GFT's of $20,607,000 (FY 2014), $20,357,000 (FY 2015), $20,107,000 (FY 2016), $19,857,000 (FY 2017), and $19,607,000 (FY 2018).

*Procedural History*

In March 2014, the Union filed a complaint for declaratory relief and petition for writ of mandate against the City, claiming that the GFT violated the City's charter and article XIII C of the

California Constitution, endangered the sound financial position of the Utility in violation of the City's charter, and created the shortfall in funds that caused Utility employees to lose their jobs and suffer reductions in pay and benefits.[4]  The operative first amended complaint contained nine causes of action and sought to "obtain declaratory relief and a writ of mandate compelling the City to abide by its obligations under the law and to restore the improperly transferred funds to the electric works revenue fund, make whole any City employees who have suffered financial losses, and rebate to [the Utility]'s ratepayers any amounts paid by them as a result of the unlawful transfer."  As relevant here, the Union claimed that the GFT fell under California Constitution article XIII C, section 1, subdivision (e)'s definition of "tax" and that the tax was unlawfully imposed, extended, or increased when the Utility's retail rates were increased without voter approval in 2013.[5]  The City filed an answer to the first amended complaint and petition for writ of mandate.

At a hearing on December 15, 2015, the trial court ordered the issues of liability and remedy bifurcated for trial.  The parties

---

[4] Glendale Coalition for Better Government (the Coalition), a nonprofit corporation formed by residents of Glendale, filed a petition against the City for writ of mandate, writ of prohibition, and declaratory relief on February 25, 2014.  The cases were consolidated for purposes of trial only.  We have omitted the procedural history pertaining to the Coalition, which is not relevant to this appeal.

[5] None of the Union's other claims are at issue in this appeal.

11

submitted trial briefs and supporting evidence.  The Union submitted the declaration of accounting expert David Vondle.

## *The Trial Court's Decision*

### <u>Liability</u>

A hearing on the petition for writ of mandate was held on June 9, 2016.  The trial court issued a tentative ruling, which it later adopted as its order.  The ruling delineated the issues as follows:  The parties agreed Proposition 26 applied prospectively, but disagreed regarding how Proposition 26 should apply, and disagreed as to whether the GFT amounts included in the retail rates for fiscal years 2012 through 2015 were properly included in those rates.  The trial court noted that the City did not contest that the GFT was included in the retail rates for the 2012 through 2015 fiscal years, or that the retail rates were increased in 2013, or that the GFT was a transfer imposed to fund the City's general service needs and not part of the actual cost of producing electricity.

The trial court concluded that Proposition 26, which took effect in November 2010, did not apply to retail rates containing a charge for the GFT prior to 2013, because those rates were set prior to its effective date.  The court rejected the City's argument that the voters approved the GFT prior to Proposition 218 and Proposition 26.  The voters approved *the transfer* prior to the propositions, but did not vote to impose retail *rates* on ratepayers to fund the transfer.  The court also rejected the City's argument that the GFT was a payment in lieu of property taxes and franchise fees to the City, and therefore a reasonable cost of

providing service.  The Utility did not pay property taxes or franchise fees and could not impose imaginary costs on ratepayers.  The court found that the City's argument that the Utility was permitted to earn a modest profit as a reasonable cost of service lacked merit in light of Proposition 26's voter approval requirement, which made no exception for modest profits. Finally, the City's argument that other revenues funded the GFT lacked merit, because the City conceded that a charge for the GFT was expressly included in the 2013 retail rates.  The City further conceded that wholesale revenues did not exceed the GFT in 2013, and the City did not provide evidence that wholesale revenues exceeded the GFT in 2014 or 2015.

The trial court ruled the Union was entitled to a declaration that the City violated Proposition 26 by including an amount to fund the annual transfers in the 2013 retail rate increases and in charges to customers for fiscal year 2014.  The court denied the Union's request for a writ of mandamus ordering the reinstatement of employees based on the Proposition 26 violations.

### **Remedy**

A second hearing on the petition for writ of mandate was held on August 11, 2016.  The trial court issued a tentative ruling, which it later adopted as its order.

The trial court rejected the City's argument that any rebate should be calculated as the difference between the amount of the retail rate minus the amount of the lawful rate, offset by any wholesale revenue used to fund the GFT.  The court previously determined there was insufficient evidence that wholesale

13

revenues funded the GFT and would not revisit that ruling. The court also rejected the City's contention that the retail rates were inadequate to cover the cost of service, which included maintaining reasonable reserves, and that the City should be permitted recoup the entire amount required to replenish reserves. The court found the funds were improperly collected and the City should not be permitted to benefit by using the funds for general purposes rather than replenishing the reserves. The court agreed with the Union that the proper remedy was to provide rebates or restitution to ratepayers in the amount of the GFT collected, and so ordered.

The City filed a motion for a new trial on November 21, 2016, which the trial court denied.

The trial court entered judgment on January 26, 2017. The City filed a timely notice of appeal from the judgment.

### *The Prior Appeal*

#### __The City's Arguments__

As relevant here, on appeal the City argued that the GFT was not a tax because Proposition 26 is not retroactive and did not vitiate the legislation that established the GTF decades earlier. Rather, the GFT was "grandfathered" in as a lawful cost of electrical service. The GFT was not invalidated post-Proposition 26 because the City did not impose, extend, or increase the GFT after its passage. The City alternatively contended that even if the GFT were a tax, it was: (1) properly approved by voters prior to the passage of Proposition 26, (2) a reasonable cost of service because it approximated the taxes a

14

private utility would pay to the City, and (3) not imposed on retail rate payers because it was funded by wholesale revenue. Finally, the City argued that if this court concluded that the GFT was an unlawful tax, the proper remedy would be recovery of the difference between the rate paid and the full costs of the Utility's service. The full costs of service included debt service and the amount required to replenish reserves, and must be offset by wholesale revenue used to fund the GFT. The City asserted that the Union was estopped from arguing that wholesale revenue could not offset the remedy. Regardless, the City was not obligated to show it identified wholesale revenues as a funding source in its budget for the relevant years in order to apply the offset.

### The Union's Response

The Union responded that the portion of the 2013 retail rate increase allocated to fund the GFT was a tax under California Constitution, article XIII C. The City's contention that Proposition 26 was not retroactive was specious—neither the Union nor the trial court took a contrary position—it was simply a creative way for the City to conflate the issues of retroactivity and "grandfather[ing]" to argue that it could continue to charge retail rate payers for the GFT indefinitely. California Constitution, article XIII C, section 2, subdivision (b) required voter approval in the event that the GFT was imposed, extended, or increased after 2010. The City's contention that the GFT was a reasonable cost of providing services mischaracterized the GFT—it was simply an interfund transfer imposed to provide revenue for general purposes, i.e. a tax. The Utility is not a

15

private utility.  Any charge in lieu of taxes is an imaginary cost.  The City's argument that the voters approved the GFT should also fail.  The voters did not approve the GFT after Proposition 26 became effective in 2010 and the GFT became a tax.  The City did not *actually* fund the GFT with wholesale revenues; the fact that it *could have* done so is irrelevant.  As the trial court concluded, the amount of the GFT embedded in the retail rate increase determined the tax.  It was irrelevant that other revenue may have been available to fund the GFT.  Finally, this court should not reduce the remedy fashioned by the trial court.  Restitution should be in the amount of full GFT charge, which was unlawfully imposed.

## The Supreme Court's Decision in *Redding*

After the parties submitted briefing on the prior appeal, our Supreme Court issued its decision in *Citizens for Fair REU Rates v. City of Redding* (2018) 6 Cal.5th 1 (*Redding*).

In *Redding*, *supra*, 6 Cal.5th at page 4, a city operating an electric utility included a transfer from the utility's enterprise fund to the city's general fund that was designed to compensate the city for services other city departments provided to the utility.  The question before the Supreme Court was "whether article XIII C applies to this interfund transfer and, if so, how." (*Ibid*.)

*Redding*, *supra*, 6 Cal.5th at page 12, held that an annual transfer itself is not a tax.  "It is only the *rate*, not the [intrafund transfer], that is imposed on customers for electric service." (*Ibid*.)  The "budgetary act of *transferring sums* from one fund to the other does not constitute' the imposition of a levy, charge, or

16

exaction by a local government on those who pay the charge." (*Ibid*.)

*Redding*, *supra*, 6 Cal.5th 1, then addressed whether the rate was a tax. The Supreme Court held that a rate is a tax if "the rates paid by . . . customers exceed[ ] the reasonable costs of providing electrical service." (*Id.* at p. 15.) "The reasonable costs include expenditures to generate and acquire electricity and other costs typical of utility operations. (*Hansen v. City of San Buenaventura* (1986) 42 Cal.3d 1172, 1181; see also [*Howard Jarvis Taxpayers Assn. v. City of*] *Roseville* [(2002)] 97 Cal.App.4th [637,] 647–648 ['what it costs to provide such services includes all the required costs . . . , short-term and long-term, including operation, maintenance, financial, and capital expenditures.']) The city bears the burden of proof on this question. (Art. XIII C, § 1, subd. (e), unenumerated par.)" (*Redding*, *supra*, 6 Cal.5th at pp. 15–16.)

The plaintiffs in *Redding*, *supra*, 6 Cal.5th at page 16, argued that the rate was a tax because the rate incorporated the transfer to the general fund as an expense, and the defendants had not shown that the transfer reflected any costs of providing electric service. The city responded that the rate was not a tax because the utility generated sufficient nonrate revenue to fund the transfer. (*Ibid*.)

The *Redding* court held: "the mere existence of an unsupported cost in a government agency's budget does not always mean that a fee or charge imposed by that agency is a tax. The question is not whether each cost in the agency's budget is reasonable. Instead, the question is whether the charge imposed *on ratepayers* exceeds the reasonable costs of providing the relevant service. If the agency has sources of revenue other than

17

the rates it imposes, then the total rates charged may actually be lower than the reasonable costs of providing the service." (*Redding, supra*, 6 Cal.5th at p. 17.)

The Supreme Court reversed the Court of Appeal, concluding: "The record shows that to be the case here. The city prepared a five-year financial plan for [the electric utility] in 2009. [Citation.] In fiscal year 2010 to 2011, when the city council adopted the rate increase, [the electric utility] was projected to collect $102.1 million in rate revenues. [The electric utility's] expenses were projected as follows: power supply ($82.3 million); operations and maintenance ($28.5 million); debt service ($13.9 million); revenue-funded capital projects ($5.2 million); rolling stock and major plant maintenance ($0.8 million); and the [annual transfer] ($6 million). These projected expenses would result in a $34.6 million shortfall between rate revenues and projected expenses. That gap was to be bridged with the surplus in the enterprise fund and revenues from a variety of nonrate sources." (*Redding, supra*, 6 Cal.5th at p. 17.) The *Redding* court held the rate was not a tax, because even if the annual transfer was not included in the in projected expenses, the rate charged would not exceed the reasonable costs of providing electrical service for the years in question. (*Ibid*.) The rate was substantially less than the reasonable costs; nonrate revenue subsidized the costs of service. (*Ibid*.) Ratepayers are not entitled to discounted rates simply because the utility has other sources of revenue. (*Id*. at p. 18.) Although a city may use nonrate revenue to subsidize retail rates, it is not required to do so. (*Ibid*.)

## **Supplemental Briefing**

We invited the parties to submit briefing to address the impact of *Redding, supra,* 6 Cal.5th 1.

In its supplemental brief, the City contended that under *Redding*, the GFT itself was not a tax. Because there was no increase in the GFT charge contained in the rate increase, Proposition 26 was not triggered and the GFT charge was not a tax, either. An increase only occurs "when an agency revises its methodology for calculating a tax and the revision results in increased taxes being levied on any person or parcel." (*Webb, supra,* 23 Cal.App.5th at p. 258.) There was no change in methodology and the flat rate of the GFT charge decreased over time. Mere annual variation in the GFT charge does not trigger Proposition 26.

The City further contended that the GFT charge was not a tax because the Utility had sufficient nonrate revenue, including sales to other utilities and wholesale revenues, to fund the GFT. *Redding* does not require the Utility to allocate nonrate revenue to cover a specific cost, the nonrate revenue need only be available to pay the cost. Moreover, the GFT charge was not a tax because it is a cost of service—the cost of complying with local laws. Finally, even if this court was to find the GFT charge was a tax, remand is required to calculate the remedy to consider net nonrate revenue and the shortfall in reserves.

In its supplemental brief, the Union argued that *Redding* was distinguishable. There, retail rates were insufficient to cover the reasonable costs of providing service even excluding the annual transfer charge. (*Redding, supra,* 6 Cal.5th 1.) Nonrate revenues necessarily covered the cost of the annual transfer, so

19

the annual transfer could not have been a tax paid by ratepayers. Here, retail rate revenue exceeded the costs of service. The City conceded that the GFT was not a cost of providing electrical service. The Pro Forma showed that the rates charged were designed to exceed operating costs.

The Union further contended that wholesale revenue did not fund the GFT. The *Redding* court only found that nonrate revenue funded the annual transfer in that case because there was a shortfall and retail rates could not have funded the transfer. Here the opposite was true. The retail rates were sufficient to cover the costs of service and the GFT charge. In fact, wholesale revenues and expenses were not even included in the Pro Forma calculation of revenue requirements. It is irrelevant that other sources *could have* been used to pay the GFT because they were not used. Regardless, net wholesale revenues were insufficient to fund the GFT. Wholesale expenses must be deducted from revenues before they may be applied to the GFT charge. Significantly, the Pro Forma did not project any wholesale revenue.

Finally, the Union argued that the tax equaled the *full charge* to ratepayers, not the amount in excess of the costs of providing service.

### Saavedra I

This court reversed the portion of the trial court's judgment that concerned tax violations. We concluded that an intrafund transfer is a budgetary allocation and not a tax under *Redding*. Only the rate is imposed on ratepayers for the costs of electric

20

service.  The rate is a tax if it exceeds the reasonable costs of providing service.

We rejected the City's argument that funding the GFT was a cost of providing service.  The GFT differs from taxes and fees imposed by the state and federal governments, which may be passed on to ratepayers.  The Utility is only required to transfer funds under certain conditions.  If there are no surplus revenues, the GFT cannot be paid.  The transfer provisions do not require the City to charge the ratepayers any amount to produce a surplus to fund the transfer.  The GFT can only be recouped from the ratepayers to the extent that it pays the Utility's expenses.  The City did not claim that the GFT paid for any actual costs of providing electricity.  We therefore concluded that the GFT was not a cost of providing service.

We next discussed the calculation of reasonable costs.  We held that "the reasonable costs of service are measured by the amount of costs that the utility projected it would need to pay when the rates were adopted.  If the rates were constitutional at the time they were imposed, extended, or increased, they do not subsequently become unconstitutional because actual costs vary from projections.  The amount of reasonable costs includes the total costs projected to provide service when the rates are adopted, even if the utility intends to pay a portion of the costs with non-rate revenue."  "[R]atepayers bear the burden of covering the costs of their service, and have no right to benefit from a utility's receipts of non-rate revenue in the calculation of rates."

We concluded that when the 2013 rates were adopted, the rates were not set to recoup the entire amount necessary to fund cash reserves that had been mandated by prior regulation.  The

21

unfunded portion of the reserves could not be considered a reasonable cost of providing service because it was not a projected cost.

We could not calculate the reasonable costs of providing service, because there were unresolved issues of fact regarding the Utility's reliance on nonrate revenues to fund the GFT. In particular, the parties disagreed whether wholesale revenues reduced the costs recovered by ratepayers, and whether the amount of wholesale revenue available to reduce costs was net wholesale revenue or gross wholesale revenue. We concluded that it was necessary to remand to the trial court to make these factual determinations in the first instance. We observed that, under either party's calculations, wholesale revenues did not fully cover the projected cost of the GFT. We therefore included guidance to the trial court to aid it in resolving whether the amount in excess of the reasonable costs of providing service was a tax that required voter approval.

We concluded that a tax in this context is the portion of the retail rate that exceeds the reasonable costs of providing service, not the entire rate, as the Union argued.

We included a section entitled "Additional Facts" in our guidance, which contained calculations comparing operating revenues to operating expenses, less any included GFT charges. We calculated that the rate revenue collected after the 2006 and 2007 rate increases as reflected in the 2006 Staff report exceeded the costs of service by $12,600,000, yielding a tax rate of 13.66 percent. We concluded that, using the Rate Study's projections for the 2014 fiscal year, rate revenue exceeded expenses by $5,792,961, or 3.51 percent of operating expenses. We noted that it was unclear whether reserves were an included

expense. As to fiscal years 2015 through 2018, we noted that rates were set to increase (7 percent, 5 percent, 2 percent, and 2 percent, respectively) and that the rate revenue was expected to fund all but $9.6 million of the cash reserves requirement. We found that the excess operating revenues in 2018 would either equal $33,325,682 (19.58 percent) or $18,755, 923 (11.02 percent),[6] depending on whether the Utility intended to contribute to its cash reserves.

We held that the portion of the rate that exceeded the reasonable costs of providing service only required voter approval if it was imposed, extended, or increased after Proposition 26 was passed in November 2010. A tax will only be deemed to have increased if it is imposed at a rate higher than the maximum rate that was previously approved. (Cal. Const., art. XIII C, § 2, subds. (b) & (d).) We concluded that the GFT charge was not improperly imposed in 2006 when retail rates were last set, as it did not fall within the definition of a tax at that time. Because the GFT charge was already included in the 2006 rates, the City did not *impose* the GFT charge when it increased retail rates in 2013. Moreover, the 2013 retail rate increase did not *extend* the GFT charge, because the 2006 rates had no termination date that would require an extension to continue.

However, we remanded the cause for the trial court to "determine from the conflicting evidence about revenues and costs employed in the rate setting process whether the excess amount of the charge was *increased* in the 2013 rates from the

---

[6] As the Union notes, our math was incorrect for this latter number. The tax rate would equal 10.15 percent, not 11.02 percent.

23

amount of the charge under the 2006 rates" in the first instance. (Italics added.)

## The Trial Court's Decision on Remand

On remand, the trial court rejected the Union's argument that the tax could be greater than the amount of the GFT. Although the burden is on the City to prove an expense is reasonable, here the Union never challenged any charge other than the GFT, and had therefore waived the argument.

Next, the trial court found that projected reserves are a reasonable cost of providing service. Although reserves did not appear as a line item cost on the Pro Forma or the Rate Study, cash generated from operations generally is used to increase reserves. Reserves may be projected from any source of funds and imposed on ratepayers as a reasonable cost of service. The Pro Forma showed that the Utility expected to generate approximately $39 million above costs other than reserves between fiscal years 2013 to 2014 and 2017 to 2018. The record demonstrated that any revenue generated in excess of the 2013 rates was earmarked for reserves. The report to city council indicated the excess was intended to replenish reserves, although not to the full recommendation of $124 million. The Union offered no evidence to the contrary. Because the reserves were projected, the amount projected must be included in the calculation of the costs of service. In contrast, wholesale revenues were not projected, and the City provided no evidence of actual wholesale revenues, so the court declined to consider them.

The trial court determined that this court's calculation of the 2006 tax, which did not include the FAC, was not binding. It

rejected the City's argument that our remand was limited to determining the amount of the 2013 tax and the question of whether the tax increased between 2006 and 2013. The trial court disagreed with the City's argument that our decision was law of the case. Our remand required the court to calculate whether the tax increased, and to do so it could consider whether our additional facts offered in guidance "state[d] the full picture." Our decision did not limit the trial court's authority to determine the 2006 tax. Significantly, neither party briefed the 2006 tax; on appeal it was only discussed at oral argument. Nor was this court's conclusion about the 2006 tax law of the case. The factual issues we addressed were not necessary to our decision.

The trial court recalculated the 2006 tax to include FAC revenues and FAC expenses, which the Staff Report explained were both included in the rate structure:

Base Rate Revenue ($104,847,000) + FAC Revenue ($57,938,000) = Total Retail Revenue ($162,785,000)

(Base Rate Expenses ($56,530,000) + FAC Expenses ($56,530,000)) – GFT ($18,254,000) = Permitted Costs ($148,008,000)

Total Retail Revenue ($162,785,000) – Permitted Costs ($148,008,000) = Excess Rate Revenue ($14,008,000)

Excess Rate Revenue ($14,008,000) / Permitted Costs ($148,008,000) = Tax Rate 9.42 percent.

The trial court reiterated that under *Saavedra I*, ratepayers may be charged for all reasonable costs of service. Costs do not include wholesale expenses if, as here, there is no evidence that they are unrelated to service. Reasonable costs of service *do* include nonoperating costs such as power management, distribution, depreciation, and debt. The court

rejected the Union's argument that only the expenses shown in the 2006 Staff Report that are also in the Pro Forma should be compared to the 2006 Staff Report to determine whether the tax rate has increased. *Saavedra I* held that all expenses must be considered, and went so far as to indicate that reserves should be included in the calculation.

In light of the foregoing, the trial court found the City's calculations of permitted costs (operating income plus nonoperating income plus reserves), excess (retail rates minus permitted costs), and tax (excess divided by permitted costs) to be correct. The chart below summarizes the findings, and related calculations:

| RATE YEAR | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Operating Revenue (retail) | $170,690,622 | $183,552,160 | $193,693,417 | $198,562,343 | $203,546,257 |
| Non-Operating Revenue (non-retail) | $7,851,641 | $8,027,381 | $8,099,475 | $9,023,217 | $9,111,882 |
| TOTAL REVENUE | $178,542,263 | $191,579,541 | $201,792,892 | $207,585,560 | $212,658,139 |
| | | | | | |
| Operating Expenses | $164,897,661 | $159,994,172 | $161,806,252 | $164,870,129 | $170,220,575 |
| Non-Operating Expenses | $5,137,265 | $5,208,425 | $5,147,675 | $6,996,456 | $8,260,806 |
| ALL EXPENSES | $170,034,926 | $165,202,597 | $166,953,927 | $171,866,585 | $178,481,380 |
| | | | | | |
| TOTAL NET INCOME | $8,507,337 | $26,376,944 | $34,838,965 | $35,718,975 | $34,176,758 |
| GFT Charge | $20,607,000 | $20,357,000 | $20,107,000 | $19,857,000 | $19,607,000 |
| Reserves (Net Income After GFT) | -$12,099,663 | $6,019,945 | $14,731,965 | $15,861,974 | $14,569,759 |
| | | | | | |
| PERMITTED COSTS (op + non-op + reserves) | $157,935,263 | $171,222,542 | $181,685,892 | $187,728,559 | $193,051,140 |
| Excess (Op rev less Perm Costs) | $12,755,359 | $12,329,618 | $12,007,525 | $10,833,784 | $10,495,117 |
| TAX RATE (Ratio of Excess to Perm Costs) | 8.08% | 7.20% | 6.61% | 5.77% | 5.44% |

Because the tax rate embedded in the 2013 utility rates would never exceed 9.4 percent, there was not an increase that required voter approval, and the Union was not entitled to monetary relief.

On November 24, 2020, the trial court entered judgment after remand. The court vacated the portions of the peremptory writ of mandate issued on January 27, 2017, that commanded the City to comply with article XIII C of the California Constitution

by ceasing to include the GFT in retail rates and to provide credit to ratepayers in installments in the amount of the GFT charged to ratepayers. The Union timely appealed.

## DISCUSSION

The Union contends that the trial court erred by calculating the amount of the tax paid by ratepayers using a different formula than this court did in *Saavedra I*. The Union argues that although we held in the prior appeal that the formula for calculating the tax was operating revenue minus operating expenses, on remand the trial court included two additional factors—nonoperating expenses and the "net income" used to fund reserves—which it subtracted from operating revenue to determine the amount of tax. The Union contends that this "apples to oranges" comparison is per se invalid. We find no error in the trial court's calculations.

### *The Trial Court Did Not Exceed the Scope of Our Remand or Improperly Consider an Argument the City Waived*

We reject the Union's contention that the trial court could not consider expenses and/or revenues that we did not consider in the first appeal to this court. We expressly remanded the case for the trial court to resolve issues of fact in the first instance—something it had not needed to do to reach its original decision. In doing so, we noted that "the City is not limited to the costs used to calculate rates in proving the total amount of the Utility's reasonable costs of service at the time rates were set." Our remand for the trial court to determine whether taxes increased

28

with the implementation of the new rates in 2013 over the taxes imposed pursuant to the rates set in 2006 encompassed any issues necessary to make that determination. That inquiry necessarily included all factfinding regarding costs and revenues during the relevant years. The trial court could properly consider reserves and nonoperating costs. The trial court did not go beyond the scope of our remittitur.[7]

Nor did the City, by failing to make the point during the prior appeal, waive its right to argue on remand that certain expenses that had been labeled nonoperating expenses in the Pro Forma in 2013 be included as costs of service. The Union did not argue until remand that the nonoperating expenses identified in the Pro Forma should not be included in cost calculations. Rather, at the time of the prior appeal, the Union was challenging the GFT and the charge for the GFT contained in the retail rates. The City could not be expected to defend costs that were unchallenged. Although the City bears the burden of

---

[7] We observe that the Supreme Court's decision in *Redding* shifted the parties' focus in this litigation, and required the trial court here to refocus its fact-finding. Prior to *Redding*, the parties concentrated on the GFT. *Redding, supra*, 6 Cal.5th at page 17, held that it was not necessarily unlawful for costs like a transfer to a city's general fund to be included in a utility's budget; the question was whether the rates paid by ratepayers exceeded the reasonable costs of providing service. Although the GFT charge remained significant in this case after *Redding*, the emphasis shifted to the reasonable costs of providing service. The GFT charge was significant because it was the only cost to ratepayers that the Union had challenged, and because this court had held the GFT charge was not a reasonable cost of providing service.

demonstrating that costs are reasonable, it bears that burden only if the costs are contested. If waiver were to apply here, it is the Union, and not the City, who waived the argument.

### *The Reasonable Costs of Providing Service Are Not Limited to Operating Costs*

In *Saavedra I*, we consistently identified the portion of the retail rate that could be deemed a tax as the amount ratepayers paid in excess of the reasonable costs of providing service. The Union ignores the prior opinion's directive, instead claiming that the prior opinion resolved that the amount of tax must be calculated as "operating revenue" minus "operating expenses" where only those costs specifically denominated by the City as "operating expenses" can be considered. This court did not address which of the Utility's expenses were reasonable costs of service in detail, because the trial court had not yet had the opportunity to "determine from the conflicting evidence about revenues and costs employed in the rate setting process whether the excess amount of the charge was increased in the 2013 rates from the amount of the charge under the 2006 rates." We indicated that reserves could be a reasonable cost of service if they were projected as an expense at the time that rates were increased. We did not restrict the reasonable costs of service to items that were listed as "operating expenses." Rather, we discussed the record before us at the time of the prior appeal, and analyzed retail rate revenue less operating expenses, as guidance to the trial court on how to approach the issues on remand. Significantly, we directed the court "to determine whether the tax increased under the 2013 rates" because the "trial court [had not

30

yet] determine[d] from the conflicting evidence about revenues and costs employed in the rate setting process whether the excess amount of the charge was increased in the 2013 rates from the amount of the charge under the 2006 rates." We did not make findings of fact that constrained the trial court's consideration of the evidence necessary to answer the questions posed on remand; the trial court was not bound to follow our guidance with a blind eye to the facts it developed, or to the application of the law to the facts.[8]

The California Constitution does not limit the tax exception set forth in article XIII C, section 1, subdivision (e)(2) to operating expenses. It states that a tax does not include a "charge imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and *which does not exceed the reasonable costs to the local government of providing the service or product*." (Cal. Const., art. XIII C, § 1, subd. (e)(2), italics added.)

---

[8] Notably, neither party contests that the trial court correctly calculated the tax set in 2006 as 9.42 percent, although the trial court's calculations were based on expense and revenue categories additional to those used by this court. Specifically, in the section of *Saavedra I* where we provided guidance, we calculated the 2006 tax by comparing the base rate revenue to the base rate expenses minus the GFT charge, and concluded that the tax rate was 13.66 percent of projected retail rate revenues. However, as the trial court correctly observed, both FAC revenues and FAC expenses were identified as part of the retail rate structure in the 2006 Staff Report, and were properly categorized as retail revenue and reasonable costs of providing service, respectively.

Additionally, *Redding, supra*, 6 Cal.5th at page 16, did not suggest that the correct formula to determine whether ratepayers were taxed is operating revenue minus operating expenses, but rather the charge to ratepayers minus the reasonable costs of providing service.  "So long as the amount charged by a local government for a service does not exceed the reasonable costs of providing it, the charge is not a tax." (*Id.* at p. 14.)  There, the plaintiffs could not make the minimal showing that retail rates covered operating costs, which were an uncontested cost of service.  It was not necessary for the Supreme Court to determine whether contested costs, such as the annual transfer, were reasonable costs of providing service.  (*Id.* at p. 18, fn. 14.)  Regardless, *Redding* did not confine reasonable costs to expenses labeled "operating expenses."  The *Redding* court stated:  "The reasonable costs include expenditures to generate and acquire electricity and other costs typical of utility operations.  (*Hansen v. City of San Buenaventura*[, *supra*,] 42 Cal.3d [at p.] 1181; see also [*Howard Jarvis Taxpayers Assn. v. City of*] *Roseville, supra*, 97 Cal.App.4th at pp. 647–648 ['what it costs to provide such services includes all the required costs . . . , short-term and long-term, including operation, maintenance, financial, and capital expenditures'].)" (*Redding*, at pp. 15–16.)

There is simply no basis for concluding that reasonable costs of providing services as calculated in 2013 should be limited to what the City had denominated as "operating expenses."

## The Utility Is Entitled to Recoup All Reasonable Costs of Providing Service

Preliminarily, we note that the Union did not dispute before the trial court that either reserves or nonoperating expenses were costs of providing electrical service. With respect to nonoperating expenses, the trial court noted that although the City argued that nonoperating costs are costs of providing electrical service, neither the Union nor the court disputed this point. The trial court attributed the City's argument to the court's own imprecise use of the words "non-operating revenues" when referring to wholesale revenues. Nonoperating expenses, which the trial court identified as including, but not limited to, power management, distribution, depreciation, and debt, were reasonable costs of providing service. The Union has forfeited any challenges to the trial court's determination of the nature of these expenses on appeal.

On remand, the Union argued that revenues and nonoperating expenses *should not be included in the calculation* of the reasonable costs of providing service because the costs were not included in the 2006 Staff Report. It reiterates this argument on appeal.

With respect to reserves, this does not appear to be an accurate assessment of the 2006 Staff Report, which stated: "The base rate is designed to recover the direct and indirect costs of providing the infrastructure to serve local customers. Such costs include, but are not limited to, the costs associated with transmission and distribution, customer service, and administration. The base rate should also include a reasonable rate of return on investments to effectuate the transfer to the

33

City's General Fund, *and to establish sufficient reserves* for ongoing capital improvement projects that ensure the reliability and integrity of the system infrastructure and upgrade the generation assets to improve the cost structure and competitiveness of the energy resources." (Italics added.) The 2006 Staff Report clearly contemplated reserves as a component of the base rate. Even if we were to accept the Union's argument, reserves would enter into our calculations.

With respect to both expenses, we agree with the trial court that there is no requirement that costs be compared one-to-one.[9] The Utility is permitted to recoup the full reasonable costs of providing service under *Redding*, *supra*, 6 Cal.5th at page 18 ("Article XIII C does not compel a local government utility to use other nonrate revenues to lower its customers' rates"). We reiterated this holding in *Saavedra I*.[10] Ignoring legitimate costs of providing service in 2013 simply because those same costs were

---

[9] The city council reviewed the 2006 Staff Report and the Rate Study, which was based in part on numbers drawn from the Pro Forma. Neither party contests that these are the three documents from which costs may be derived. (See, e.g., *Santa Clarita Organization for Planning & Environment v. Castaic Lake Water Agency* (2016) 1 Cal.App.5th 1084, 1103 ["Judicial review of quasi-legislative agency actions is generally confined to the record that was before the agency"].)

[10] The Union observes that if the entire amount in excess of other reasonable costs of providing service is deemed to be permitted as reserves "there would be no limit to the amount a utility can charge its ratepayers, upending the very purpose of Prop 26." This argument ignores that the amount charged to recoup reserves must be reasonable. The Union did not challenge the reasonableness of the rates charged to replenish reserves.

34

not expressly identified in the 2006 Staff Report would flout this rule.  The trial court did not err by including all reasonable costs of providing services in its calculations.

## DISPOSITION

We affirm the trial court's judgment.  The City of Glendale is awarded its costs on appeal.

NOT TO BE PUBLISHED.


MOOR, J.


We concur:


RUBIN, P. J.


KIM, J.