Filed 10/25/23 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MICHAEL E. BOYD,<br><br>      Plaintiff and Appellant,<br><br>      v.<br><br>CENTRAL COAST COMMUNITY ENERGY,<br><br>      Defendant and Respondent. | H050140<br>(Santa Clara County<br>Super. Ct. No. 21CV02057)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on October 4, 2023, be modified as follows:

1.      On page 11, the second paragraph shall be deleted and replaced with the following:

   In his opening brief, Boyd contended that the record on appeal does not contain the administrative record lodged in the trial court and therefore 3CE should be deemed to have not met its burden of proof. In fact, as Boyd implicitly recognized in his reply brief, on September 19, 2022, the administrative record was received in this court. Boyd also complains about the size of the administrative record. While, as a pro se litigant, Boyd's discomfort with the size of the record is understandable, the record's size provides no reason for doubting that the trial court's findings are supported by sufficient evidence.

2.      On page 13, the second full paragraph shall be deleted and replaced with the following:

   The trial court also found that the adjusted rates that 3CE adopted in December 2021 due to increased energy costs did not exceed 3CE's reasonable

costs.  Although Boyd challenged this rate adjustment, besides his objection to the loan financing the lease to the Santa Cruz County jail discussed above, he makes no argument in his briefs on appeal concerning the reasonable cost of the adjustment's increase in rates and therefore has forfeited any challenge to the trial court's ruling concerning the adjustment.  (See, e.g., *Tiernan v. Trustees of Cal. State Univ. & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 ["Plaintiff has not raised this issue, however, and it may therefore be deemed waived."].)

There is no change in the judgment.

Appellant requests reconsideration of various issues, but he has failed to demonstrate any material error in the opinion.  (See, e.g., *San Francisco v. Pacific Bank* (1891) 89 Cal.23, 25; *Alameda County Management Employees Assn. v. Superior Court* (2011) 195 Cal.App.4th 325, 338, fn. 10.)

Appellant's petition for rehearing is denied.

                                              _____
                                              BROMBERG, J.


WE CONCUR:




_____
GREENWOOD, P.J.




_____
BAMATTRE-MANOUKIAN, J.




*Boyd v. Central Coast Community Energy*
H050140

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MICHAEL E. BOYD, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CENTRAL COAST COMMUNITY ENERGY, <br><br> Defendant and Respondent. | H050140 <br> (Santa Cruz County <br> Super. Ct. No. 21CV02057) |

Over the last five decades, California voters have adopted a series of initiatives limiting the authority of state and local governments to impose taxes without voter approval.  (See, e.g., *Citizens for Fair REU Rates v. City of Redding* (2018) 6 Cal.5th 1, 10 (*Citizens for Fair REU Rates*).)  Among other things, voters added Article XIII C of the California Constitution, which requires local and regional governmental entities to secure voter approval for new or increased taxes (Cal. Const., art. XIII C, § 2, subds. (b)-(d)) and defines taxes broadly to include any charges imposed by those entities unless they fall into one of seven enumerated exceptions (*id*., art. XIII C, § 1, subd. (e).)  The second of these exceptions covers charges for services or products that do not exceed reasonable costs.  (*Id.,* art. XIII C, § 1, subd. (e)(2).)

Appellant Michael Boyd contends that the electricity rates charged by a regional governmental entity, respondent Central Coast Community Energy (3CE), are invalid because they are taxes under Article XIII C that voters have not approved.  The trial court rejected this contention on two grounds:  (1) 3CE's rates are not taxes under Article XIII C's general definition of taxes and (2) 3CE's rates fall within the second exception to that

definition because they do not exceed 3CE's reasonable costs. We agree in part. We conclude that 3CE's rates are taxes under Article XIII C's general definition of taxes, but they fall within the second exception to that definition because 3CE proved that its rates do not exceed its reasonable costs. Accordingly, we affirm the judgment dismissing Boyd's claims.

## I.  Background

### A.  *3CE*

3CE is a joint powers authority formed by the counties of Monterey, Santa Cruz, San Benito, Santa Barbara, and San Luis Obispo as well as certain cities and towns within those counties. 3CE, originally named Monterey Bay Community Power, exercises the authority of these governmental entities to form a "community choice aggregator," which combines the purchasing power of participating customers in negotiating with privately owned electrical utilities. (Pub. Util. Code, § 366.2, subd. (c)(1); see also *id*., § 331.1 [defining "community choice aggregator"].) In July 2018, after notifying potential customers of their right to opt out of its services and obtain electricity from a privately owned electrical utility (see *id*., § 366.2, subd. (c)(15)(A)), 3CE began supplying electricity to residential customers.

### B.  *3CE's Rates*

In 2018, following a common practice, 3CE set its initial rates using an " 'investor owned utility-minus' model." Under this model 3CE based its rates on those charged by PG&E, the privately owned electrical utility serving most of 3CE's service area. To calculate its rates, 3CE took PG&E's rates, subtracted surcharges compensating PG&E for customers lost to community choice aggregators (such as 3CE), and applied a 3 percent discount.

After operating for several years, 3CE developed a new rate model based on its own costs of service. In June 2021, 3CE adopted this cost-of-service model and set new rates based on it.

Shortly afterwards, energy prices increased sharply. Accordingly, in December 2021, again using its cost-of-service model, 3CE adopted an adjustment increasing its rates in light of the rising power supply costs.

With this adjustment, 3CE projected $412 million in net revenues and an equal amount in costs. $351 million (about 85 percent) of the projected costs were for long-term electrical generation, spot-market purchases, and other power supply costs. 3CE's costs also included $28.2 million (7 percent) for enterprise expenses and member services costs, $18.5 million (4.5 percent) for rate stabilization, and $14.7 million (3.5 percent) for energy programs.

C. *The Proceedings Below*

In August 2021, Michael Boyd, a residential customer who did not opt out of 3CE's service, filed a petition for a writ of mandate. Representing himself pro se, Boyd claimed that 3CE's initial rates adopted in 2018 using the "investor-owned utility-minus" model, the rates adopted in June 2021 using the cost-of-service rate model, and the adjustments that 3CE was then considering (and adopted in December 2021) were taxes under Article XIII C that exceeded 3CE's reasonable costs of service. Because these alleged taxes had not been approved by voters, Boyd contended that they were invalid and should be set aside.

After lodging the administrative record with the trial court and filing a declaration from its chief executive officer, 3CE argued that the petition should be denied on the ground that the rates it charges are not taxes under Article XIII C's general definition of taxes. In particular, 3CE contended that its rates are not "imposed" on ratepayers, as the general definition requires, because the term "imposed" denotes a payment that is "compulsory, mandatory, or established or applied by force," and 3CE's ratepayers have the ability to opt out of its services and receive electricity from a private utility such as PG&E.

3

Alternatively, 3CE argued that, if its rates are taxes under Article XIII C's general definition, they fall within the exception for service charges that do not exceed its reasonable costs. In support of this argument, 3CE relied on the administrative record and a declaration from its chief executive officer explaining 3CE's rate structures and costs. In response, Boyd submitted a four-page declaration to which he attached various excerpts from the administrative record, but no evidence concerning 3CE's costs.

After a hearing, the trial court denied Boyd's petition. Implicitly accepting 3CE's interpretation of the word "imposed," the court ruled that the rates charged by 3CE were not taxes because Boyd could opt out of them.

The trial court also accepted 3CE's alternative argument that, even if its rates are taxes under Article XIII C's general definition, they fall within the exception for charges that do not exceed reasonable costs. First, with respect to 3CE's initial 2018 rates, the court found that PG&E's rates were a reasonable proxy for 3CE's costs because community choice aggregators such as 3CE generally have higher costs than privately owned utilities, and also that 3CE's initial rates did not exceed its reasonable costs because those rates were based on PG&E's rates. Second, the court found that 3CE's June 2021 rates did not exceed its reasonable costs because they were 19 percent lower than PG&E's rates for comparable services and because 3CE's projected revenues equaled its projected costs. Finally, the court found that 3CE's December 2021 adjustment did not exceed 3CE's reasonable costs.

On June 23, 2022, 3CE served a notice of entry of judgment on Boyd, who noticed an appeal that same day.

## II. Discussion

In determining whether 3CE's rates are valid under Article XIII C, we construe the relevant constitutional provisions de novo and apply them based on an independent review of the record. (*Cal. Farm Bur. Federation v. State Water Resources Control Bd.* (2011) 51 Cal.4th 421, 436; *Prof. Engineers in Cal. Government v. Kempton* (2007) 40

4

Cal.4th 1016, 1032 (*Kempton*).) However, in reviewing the record, we do not reweigh the evidence. Instead, we presume that the trial court's findings of fact are correct and review those findings for substantial evidence, crediting the evidence supporting the prevailing party and drawing all reasonable inferences in that party's favor. (*City of San Buenaventura v. United Water Conservation Dist.* (2022) 79 Cal.App.5th 110, 119-120; *Schmeer v. County of Los Angeles* (2013) 213 Cal.App.4th 1310, 1316.)

We conclude that the rates charged by 3CE are taxes under Article XIII C's general definition of taxes because they are "imposed" under the Supreme Court's long-standing interpretation of that term. However, we conclude that the rates fall within the second exception to the general definition because 3CE proved that its rates do not exceed its reasonable costs.

A. *Article XIII C*

Article XIII C was adopted in two phases. First, in 1996, voters passed Proposition 218. (*Citizens for Fair REU Rates, supra*, 6 Cal.5th at p. 10.) This proposition added Article XIII C, which prohibits local governments from imposing, increasing, or extending taxes without voter approval. (*Id.* at pp. 10-11; see also Cal. Const., art. XIII C, § 2, subd. (b) [requiring majority approval for general taxes]; *id.*, art. XIII C, § 2, subd. (d) [requiring two-thirds approval for special taxes].) Second, in 2010, voters passed Proposition 26. Finding that "the Legislature and local governments have disguised new taxes as 'fees'" to evade "constitutional voting requirements" (Voter Information Guide, Gen. Elec. (Nov. 2, 2010) text of Prop. 26, § 1, subd. (e), p. 114.), Proposition 26 "broaden[ed] the definition of state or local tax to include many payments currently considered to be fees or charges." (*Id.*, Official Title and Summary, p. 58.)

As amended, Article XIII C makes all charges imposed by local governments presumptively taxes. The article contains a broad general definition of tax covering any charges (as well as levies or exactions) imposed by a local governmental entity: "As used in this article, 'tax' means any levy, charge, or exaction of any kind imposed by a

5

local government . . . ." (Cal. Const., art. XIII C, § 1, subd. (e); *see also id*., § 1, subd. (b) [defining local government to include "any . . . local or regional governmental entity"].) This broad general definition is subject to seven enumerated exceptions. (*Id.,* art. XIII C, § 1, subds. (e)(1)-(7).) The second exception covers charges for products or services that do not exceed reasonable costs: "A charge imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product." (*Id.*, art. XIII C, § 1, subd. (e)(2).) Local governments bear the burden of proving that a charge is not a tax, including whether the amount of the charge is no more than needed to recover reasonable costs. (*Id.*, § 1, subd. (e).)

Boyd asserts that, to satisfy its burden of proof and show that a charge is not a tax, a local government entity such as 3CE must put the charge to a vote. That puts the cart before the horse. As the Supreme Court has recognized, voter approval is needed only "[i]f a levy, charge, or exaction is imposed by a local government and does not fit within an exception." (*Citizens for Fair REU Rates*, *supra*, 6 Cal.5th at p. 12.) Thus, before requiring voter approval of a charge, courts must determine whether the charge falls within Article XIII C's general definition of tax and, if so, whether any exception applies. We now turn to those questions.

B. *Article XIII C's General Definition of Tax*

The rates charged by 3CE fall squarely within the general definition of tax in Article XIII C because 3CE is a local governmental entity and it established the rates. 3CE argues that an additional requirement—that customers have no alternative way to obtain the product or service provided by 3CE—must be satisfied. But 3CE fails to offer any plausible basis for this requirement.

As the Supreme Court has interpreted it, the general definition of tax in Article XIII C is broad. Article XIII C defines "tax" to mean "any levy, charge, or exaction of any kind imposed by a local government" unless it falls within one of seven exceptions.

6

(Cal. Const., art. XIII C, § 1, subd. (e).)  The Supreme Court has held that this definition uses the " 'ordinary meaning' of ' "impose," ' " which is "merely to ' "establish." ' " (*Zolly v. City of Oakland* (2022) 13 Cal.5th 780, 791 (*Zolly*), citing *Cal. Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 944 (*Cannabis Coalition*).)  Thus, under the Supreme Court's interpretation, any charge that is stablished by a local government entity is a tax under Article XIII C's general definition.  (See *Zolly*, at p. 791 [agreeing that "it is sufficient that Oakland 'established' [franchisee] fees by exercising its legal authority to execute the two franchise agreements"].)

The rates charged by 3CE fall squarely within Article XIII C's general definition of tax as interpreted by the Supreme Court.  3CE is a "local government" under Article XIII C because the article defines "local government" to include "any . . . regional governmental entity" (Cal. Const., art. XIII C, § 1, subd. (b)), and 3CE is a joint powers authority formed of cities, towns, and counties.  In addition, 3CE's rates were established by its board of directors under authority granted by the joint powers agreement forming the entity.  As a consequence, the rates established by 3CE are charges imposed by a local government and therefore fall within Article XIII C's general definition of taxes under the Supreme Court's interpretation of that definition.

The trial court held that 3CE's rates were not taxes under Article XIII C because its customers could opt out of the rates and choose to receive electricity from a privately owned utility instead.  3CE urged the trial court to reach this conclusion, and then initially defended it on appeal, on the theory that the word "imposed" as used in Article XIII C's general definition of tax "denotes payment that is compulsory, mandatory, or established or applied by force."  In *Zolly*, however, the Supreme Court considered whether Article XIII C's general definition contains a coercion requirement and expressly rejected the suggestion, holding that "[t]he text of Article XIII C dispels the notion that a local government can only 'impose[]' a tax by means of coercion."  (*Zolly*, *supra*, 13 Cal.5th at p. 791.)  When this court requested supplemental briefing concerning this

7

ruling in *Zolly*, 3CE made no attempt to defend the interpretation it had advanced in the trial court and in its opening brief. Instead, as 3CE acknowledged at oral argument, it abandoned that interpretation.

3CE now argues that "the critical issue is choice" and that the rates it charges are not taxes under Article XIII C's general definition of taxes because they leave open an alternative way to obtain the services provided by 3CE (switching to another provider, such as PG&E). Thus, 3CE seeks to add to the general definition of taxes a requirement that any charges established by a public entity leave open no alternative way to obtain the service or product provided in exchange for that charge.

We are not persuaded. 3CE has not pointed to anything in the Supreme Court's decision in *Zolly* that supports its no-alternative requirement, and it conceded at oral argument that it could not cite any decision adopting such a requirement. Even more important, 3CE has not explained how this requirement can be derived from any definition of "impose" or any other language in Article XIII C, the Article's structure, its purpose, or any other recognized tool of construction. As a consequence, 3CE appears to be asking the court to engraft an unstated, extratextual restriction onto Article XIII C, which is something we may not do. (See, e.g., *Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 543 ["the court may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language"]; see also *Kempton*, *supra*, 40 Cal.4th at p. 829 [" '[i]n interpreting a voter initiative. . ., we apply the same principles that govern statutory construction' "].)

Creating an unstated, extratextual restriction would be particularly inappropriate here. The voters passed Proposition 26 and adopted a new definition of taxes to prevent state and local governments from evading the "constitutional voting requirements" on new taxes by imposing new taxes disguised as fees or charges. (Voter Information Guide, Gen. Elec. (Nov. 2, 2010) text of Prop. 26, § 1, subd. (e), p. 114.) Accordingly, Article XIII C adopts a broad general definition of tax, subject to seven enumerated

8

exceptions.  (Cal. Const., art. XIII C, § 1, subds. (e)(1)-(e)(7).)  Four of these exceptions are categorical, covering things such as entrances fees and penalties that presumably pose little danger of hidden taxes.  (*Id*., art. XIII, C, § 1, subds. (e)(4)-(7).)  The remaining three exceptions are general in nature, covering charges for benefits and privileges, services and products, and regulatory fees so long as the charges are for "reasonable regulatory costs" or "do[] not exceed the reasonable costs to the local government."  (*Id*., art. XIII, C, § 1, subds. (e)(1)-(3).)  It is unlikely that the voters intended to include in this carefully constructed, comprehensive scheme an additional, unstated no-alternative requirement.  (See *Cannabis Coalition*, *supra*, 3 Cal.5th at p. 933 [interpretation of voter initiatives should "tak[e] account of related provisions and the structure of the relevant statutory and constitutional scheme"].)

Pointing to the statutes creating community choice aggregation agencies, 3CE argues that treating rates charged by community choice aggregators as taxes would undermine their ability to function because aggregators often operate in multiple jurisdictions and, as a practical matter, cannot obtain voter approval for rate increases in each of those jurisdictions.  Article XIII C, however, does not require voter approval of all charges that fall within its general definition of taxes: as just noted, there are seven enumerated exceptions to this general definition, including one for rates charged for products or services that "do[] not exceed the reasonable costs to the local government" (Cal. Const., art. XIII C, § 1, subd. (e)(2).), which applies to electrical service.  (*Humphreville v. City of Los Angeles* (2020) 58 Cal.App.5th 115, 123 (*Humphreville*).)  Consequently, 3CE can avoid having to obtain approval from all the jurisdictions within its service area by making sure that its charges do not exceed its reasonable costs.

Accordingly, we conclude that the rates charged by 3CE fall within Article XIII C's general definition and therefore are presumptively taxes.

9

C.  *Article XIII C's Second Exception*

Nonetheless, 3CE's rates are not taxes under Article XIII C because 3CE was able to prove that they fall under the second exception to the article's general definition.  The second exception applies to charges by a local government "imposed for a specific government service or product provided directly to the payor that is not provided to those not charged" and "do[] not exceed the reasonable costs to the local government of providing the service or product."  (Cal. Const., art. XIII C, § 1, subd. (e)(2).)  The rates at issue here are for a specific government product (electricity) that is provided only to payors, and, as the trial court properly found, 3CE proved that these rates do not exceed the reasonable costs of the product.

### 1.  3CE's Initial Rates

Boyd asserts that 3CE failed to satisfy its burden of proving that its initial rates did not exceed its reasonable costs because the relationship between those rates and the costs of providing them is indiscernible.  We disagree.  The evidence presented by 3CE adequately showed that its initial rates did not exceed its reasonable costs.

3CE presented evidence that its 2018 rate structure was based on an " 'investor owned utility-minus' model."  In calculating its rates under this model, 3CE began with the rates charged by PG&E, the incumbent privately owned utility for most of 3CE's operating area; subtracted from PG&E's rates certain charges designed to compensate PG&E for the loss of customers to community choice aggregators (such as 3CE); and then applied a 3 percent discount or rebate.  3CE also presented testimony that the rates of privately owned utilities are based on their costs of service, and that community choice aggregators have higher costs because they face risks that privately owned utilities do not and, among other things, must build up reserve funds to account for those risks.  Boyd failed to present any contradictory evidence.  As a consequence, the trial court reasonably found that 3CE's initial rates did not exceed its reasonable costs and therefore fall within Article XIII C's second exception.

Noting that, unlike PG&E, 3CE is not regulated by the California Public Utilities Commission, Boyd asserts that PG&E's rates bear no reasonable relationship to the benefit he and other payors received from 3CE. PG&E and 3CE, however, supply the same basic product—electricity—and Boyd offers no reason to believe that the benefit to consumers from electricity supplied by PG&E differs significantly from the benefit from electricity supplied by 3CE. In any event, while Article XIII C has an exception for charges imposed for "a specific *benefit* conferred" (Cal. Const., art. XIII C, § 1, subd. (e)(1), italics added), the second exception, the one relevant here, applies to charges imposed for "a specific government *service or product*" and makes no mention of benefit (*id*., art. XIII C, § 1, subd. (e)(2), italics added).

Boyd also contends that the record on appeal does not contain the administrative record lodged in the trial court and therefore 3CE should be deemed to have not met its burden of proof. In fact, on September 19, 2022, the administrative record was received in this court. Boyd also complains about the size of the administrative record. While, as a pro se litigant, Boyd's discomfort with the size of the record is understandable, the record's size provides no reason for doubting that the trial court's findings are supported by sufficient evidence.

Thus, substantial evidence supports the trial court's finding that 3CE's initial rates did not exceed its reasonable costs, and therefore we conclude that those initial rates fall within Article XIII C's second exception and are not taxes.

2. The 2021 Rates

Boyd also challenges the trial court's finding that the rates adopted by 3CE in June 2021 did not exceed its reasonable costs. Here again, however, substantial evidence supports the trial court's finding. In June 2021, 3CE adopted a rate model based on its costs. In addition, 3CE showed that under this model its projected costs equaled its projected revenues. Indeed, out of $412 million in total costs, roughly 85 percent ($350 million) were related to power supply, and the remaining 15 percent were for member

11

services and other enterprise expenses ($28.2 million), the rate stabilization fund ($14.7 million), and energy programs ($14.7 million). Boyd does not challenge the amount of any of these costs or that, combined, they equaled 3CE's revenues; and in any event 3CE presented evidence that the resulting rates were nearly 20 percent below PG&E's. As a consequence, the trial court properly inferred that 3CE's June 2021 rates did not exceed its reasonable costs.

Boyd points out that 3CE had a surplus of nearly $18.5 million in June 2021. But the mere fact that a utility has a surplus does not mean that its rates are excessive, even where that surplus is transferred into a municipality's general fund. (See *Citizens for Fair REU Rates*, *supra*, 6 Cal.5th at pp. 16-19 [where utility did not use rate revenues to make transfers to city's general fund, its transfers did not show the rates it charged were excessive]; *Humphreville*, *supra*, 58 Cal.App.5th at pp. 124-127 [transfers did not show rates were excessive where rates did not exceed reasonable cost of service].) In addition, the trial court had good reason to reject Boyd's contention that 3CE's rates generated a real surplus. The surplus identified by Boyd was from a mid-year treasurer's report, which took a snapshot of 3CE's position at the time of the report. Other evidence showed that by the end of the year, far from running a surplus, 3CE's net position had declined $7.8 million. The trial court reasonably could have inferred from this decline that 3CE's rates did not exceed its reasonable costs.

Finally, Boyd objects that 3CE agreed to make a $2 million loan to the Santa Cruz County jail to finance the lease of backup generation facilities. While Boyd denies that this lease benefited him, he does not suggest that the lease in any way affected the costs of the services provided to him. In any event, "the mere existence of an unsupported cost in a government agency's budget does not always mean that a fee or charge imposed by that agency is a tax." (*Citizens for Fair REU Rates*, *supra*, 6 Cal.5th at p. 17.) "Instead, the question is whether the charge imposed *on ratepayers* exceeds the reasonable costs of providing the relevant service." (*Ibid*.) Because substantial evidence supported the trial

12

court's finding that the 2021 rates charged by 3CE for electrical service did not exceed the reasonable costs of providing that service, the lease of backup generation equipment to the Santa Cruz County jail is immaterial.

In short, substantial evidence supported the trial court's finding that the rates charged by 3CE in July 2021 under its cost-of-services rate model did not exceed reasonable costs and therefore were not taxes under Article XIII C's second exception.

### 3. The Rate Adjustment

The trial court also found that the adjusted rates that 3CE adopted in December 2021 due to increased energy costs did not exceed 3CE's reasonable costs. Although Boyd challenged this rate adjustment in his petition, he makes no argument in his briefs on appeal concerning the adjustment and therefore has forfeited any challenge to the trial court's ruling concerning the adjustment. (See, e.g., *Tiernan v. Trustees of Cal. State Univ. & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 ["Plaintiff has not raised this issue, however, and it may therefore be deemed waived."].)

## III. Disposition

The trial court's judgment is affirmed. The parties shall bear their own costs on appeal.

_____
BROMBERG, J.

WE CONCUR:



_____
GREENWOOD, P.J.




_____
BAMATTRE-MANOUKIAN, J.




*Boyd v. Central Coast Community Energy*
H050140

Trial Court:                                    Santa Cruz County Superior Court

                                                Superior Court No.: 21CV02057


Trial Judge:                                   The Honorable Timothy R. Volkmann


Plaintiff and Appellant

MICHAEL E. BOYD:                            Pro Per


Attorneys for Defendant and Respondent

CENTRAL COAST COMMUNITY ENERGY:

                                        CENTRAL COAST COMMUNITY ENERGY

                                                Brian Christopher Kimball

                                            MEYERS NAVE SILVER & WILSON

                                                Margaret Wieland Rosequist

                                                Deborah Jean Fox

H050140

Boyd v. Central Coast Community Energy